## KEITH v STATE

Ohio Appeals, 7th Dist, Trumbull Co

Decided March 7, 1936

Jay Buchwalter, Warren, for plaintiff in error.

George W. Secrest, Prosecuting Attorney, Warren, for defendant in error.

## OPINION

By NICHOLS, J.

On the 28th day of August, 1934, B. J. Gillen filed an affidavit in the Municipal Court of the City of Warren, Trumbull County, Ohio, charging that on or about the 24th day of July, 1934, at the county of Trumbull, one LeRoy Keith did unlawfully, purposely and while in the perpetration of a robbery, kill one Fred Griest, contrary to §12400, GC, and against the peace and dignity of the state of Ohio. LeRoy Keith being arraigned upon such affidavit plead not guilty, waived preliminary hearing and was committed to the jail of the county.

Thereafter, on the 14th day of September, 1934, the grand jury of Trumbull County returned an indictment against LeRoy Keith charging that on or about the 24th day of July, 1934, LeRoy Keith unlawfully, purposely and of deliberate and premeditated malice killed one Fred Griest, contrary to the statute in such case made and provided, and against the peace and dignity of the state of Ohio. The accused was brought to trial in the Court of Common Pleas of the county before the Honorable Lynn B. Griffith, judge of such court, and a jury. The trial resulted in the verdict of guilty, as charged in the indictment, without a recommendation of mercy. The defendant was sentenced to death.

Error was prosecuted to this court by LeRoy Keith, and the judgment of the Common Pleas Court was reversed for error in the charge of the court to the jury and the cause remanded to the Common Pleas Court for further proceedings according to law. This court upon such error proceeding stated in its opinion that it deemed it unnecessary to pass upon other errors urged

by counsel for plaintiff in error at that time. Mandate from the Court of Appeals was filed in the Common Pleas Court June 18, 1935, and on June 27, 1935, as shown by the journal of the court, it was ordered that a jury be drawn from the jury wheel for the retrial of LeRoy Keith on a charge of murder in the first degree, the date of the new trial being fixed for July 22, 1955. On July 17, 1935, apparently upon his own motion, the judge of the Common Pleas Court ordered that the venire drawn for the new trial be discharged for the reasons set forth upon the journal of the court, as follows:

"Whereas, it has come to the attention of the court that certain irregularities have occurred in the selection of the names placed in the jury wheel from which the venire in this cause was drawn, in this, to-wit: that there was discrimination against persons of the colored race and persons who are naturalized citizens, and it further appearing that the defendant, LeRoy Keith, is one of the negro race; and whereas, for the above reasons it appears to the court that said case should not come on for trial until the next term of court, at which time a new list of prospective jurors will have been placed in the jury wheel," the venire hereinbefore drawn be discharged, etc.

As shown by the docket and files of the court under date of October 24, 1935, a motion was filed in the Common Pleas Court by the defendant, LeRoy Keith, to quash the indictment theretofore found against him on the 14th day of September, 1934, and upon which the proceedings hereinbefore set forth had been had, the defendant setting forth in his motion that he is a negro and that all persons of the African and negro race have been purposely excluded from the grand jury because of their race, although about three and one-half per cent of the inhabitants of Trumbull County, competent under the law to act as grand jurors, were of that race, and also setting forth in the motion that the grand jury was not a duly selected, qualified and impanelled grand jury in that the grand jurors of such county for the September Term 1934 of such court who presented the indictment against him were not impartial as guaranteed by the Constitution of the United States under the Fourteenth Amendment thereof, and the Constitution of the state of Ohio, for the reason that competent colored persons had been purposely excluded from such grand

jury. After hearing had upon the motion filed by the defendant to quash the indictment against him, the Common Pleas Court on the 24th day of October, 1935, as shown by the journal of that court, found that the jury commission of Trumbull County had discriminated against persons of the negro race in the selection of the jurors that composed the grand jury that returned the indictment against the defendant; found that the defendant is a negro and that the aforesaid discrimination against persons of his race is prejudicial to his rights under the Constitutions of the United States and of the state of Ohio, and the court therefore sustained defendant's motion and the indictment was quashed.

In the entry wherein the court quashed the indictment against the defendant, the court further ordered as follows:

"But it appearing that there is good cause to detain said defendant in custody, it is ordered that he be committed to the custody of the Sheriff to be held without bail and that the case be resubmitted to the grand jury."

On the 25th day of October, 1935, a new indictment was returned by the grand jury of the county against LeRoy Keith wherein it was again charged that LeRoy Keith on or about the 24th day of July, 1934, at the county of Trumbull, unlawfully, purposely and of deliberate and premeditated malice killed one Fred Griest, contrary to the statute in such case made and provided, and against the peace and dignity of the state of Ohio.

It will be observed that the indictment returned against the defendant on October 25, 1935, is in identical language with the indictment returned against the defendant September 14, 1934, except as to the recital of the term at which the indictment was returned.

October 28, 1935, the defendant, LeRoy Keith, filed his motion to quash the indictment returned against him on October 25, 1935, first alleging in the motion that there is a defect upon the face of the record in that the new indictment returned against him was filed and docketed on the criminal docket of Trumbull County under No. 6135, being the same number under which the first indictment had been filed and docketed against him on the criminal docket of such court. In the motion the defendant alleged that the second indictment was a new and different indictment; that the case of The State of Ohio v LeRoy Keith, No. 6135, had been terminated and quash-

ed and that by reason thereof case No. 6135 has been adjudicated and dismissed, and the defendant discharged under case No. 6135. On the same day, to-wit: October 28, 1935, the defendant filed his written plea on arraignment wherein he plead, first, "not guilty" and second, "once in jeopardy." In his written plea on arraignment the defendant set forth the fact of his first indictment, his trial upon the merits thereof, and the former verdict of the jury; and that by reason thereof he had theretofore been placed in jeopardy for the same offense as that alleged in the second indictment against him.

While the statute provides that a jury shall first be impanelled to determine the question of the former jeopardy of the defendant, this statutory procedure seems not to have been followed in this case, the docket and journal entry of the court showing that on November 16, 1935, the motion to quash was argued, evidence offered, and the motion overruled by the court to which exceptions were noted on behalf of the defendant. Thereafter, a jury was impanelled in the Common Pleas Court, and the defendant tried upon the indictment returned against him October 25, 1935, resulting in a verdict of the jury finding the defendant guilty of murder in the first degree without recommendation of mercy. Judgment was rendered upon this verdict and error duly prosecuted to this court on behalf of the defendant below. Herein the State of Ohio will be referred to as palintiff and LeRoy Keith will be referred to as defendant.

In brief and oral argument in this court counsel for the defendant urges: First, the verdict of the jury is against the weight of the evidence. Second, former jeopardy of the defendant. Third, error of the trial court in admitting the testimony of Ernest Baugh, Flossie Parham and Clinton Parham given at the trial under the indictment of September Term 1934, which indictment was declared invalid by the court and quashed after trial, conviction and reversal. Fourth, error of the Common Pleas Court in overruling the motion made by defendant below at the close of the State's evidence upon the ground that there was a fatal variance between the indictment and the evidence, and that there is in the record a fatal variance between the indictment and the record.

We will first consider the claim of defendant that he had been once before in jeopardy for the same offense charged in the indictment.

Under the state of the record as herein-before outlined was the defendant, LeRoy Keith, in jeopardy upon the indictment returned against him at the September Term 1934? With much force, counsel has argued to this court that the defendant certainly was in jeopardy because he was tried, convicted, and sentenced to death under the first indictment, and the first indictment having been quashed by the court it is contended that to subject defendant to trial upon the new indictment would be to deprive him of the constitutional guaranty that no person shall be twice put in jeopardy for the same offense. The first indictment in this cause was regular in every respect upon its face and no objection was made to it at the first trial. It having been discovered subsequent to the first trial that persons of the negro race had been discriminated against in the impanelling of the grand jury that returned the original indictment, such indictment was then quashed by the court upon motion of the defendant. There was, in fact, a trial upon an indictment valid on the face thereof and charging the same offense as set forth in the second indictment. Although good in form and substance upon its face, it is insisted that the first indictment was in fact and law no indictment against this defendant of the negro race because in the selection of the names placed in the jury wheel from which the grand jury was drawn there was discrimination against persons of the colored race whereby the defendant was prejudiced because of the violation of the guarantee of equal rights under the Fourteenth Amendment of the Constitution of the United States. It was for the defendant to choose whether he would insist upon the observance of his guaranteed constitutional right in the selection and impanelling of this grand jury, and it might well be that the defendant would prefer not to insist upon this constitutional guarantee, deeming that the exclusion of members of his own race in the selection of the grand jury would be for his benefit rather than prejudicial to him.

The facts with reference to the manner of selecting names for the jury wheel in Trumbull County were as easily ascertainable before the first trial as at the time the Common Pleas Court of its own motion first discharged the petit jury in this case for discrimination in the placing of names in the jury wheel. Can it be said that the defendant could go to trial with knowledge that the indictment against him was void, receive the benefit of a trial at which he might be found not guilty, but when the result of such trial is found to be against

him he can move to discharge the indictment on the ground that it is void and upon the court sustaining his objection, go hence without the right of the state to bring him to further trial for the same offense? The effect of so holding, it seems to this court, would give to a defendant of the negro race a guarantee of rights not possessed by other citizens of the United States and would make of the Fourteenth Amendment, not a guarantee of equal rights, but a guarantee of special privilege to the negro race. From this reasoning can be seen the reason for a line of decisions, not only in the state of Ohio but in the United States, to the effect that where an indictment is nolled on the motion of the defendant he can not, when reindicted for the same offense, plead former jeopardy. Although sufficient in form and substance on its face, the indictment in this case was, nevertheless, defective upon the constitutional grounds referred to.

"It may be stated as a general rule that where an indictment is quashed at the instance of the defendant, though after jeopardy has attached, he cannot thereafter plead former jeopardy when placed on trial on another indictment for the same offense." 12 Ohio Jurisprudence, 194, §156; Sigourney v State, 6 Oh Ap, 156.

The syllabus in the last cited case is as follows:

"Where a verdict of not guilty has been directed on the application of the defendant, on the ground that the indictment was fatally defective, he cannot thereafter plead former jeopardy when reindicted for the same offense."

From 12 Ohio Jurisprudence, 195, §156, we quote: "Where the court in the first trial directs a verdict, at the instance of the defendant, on the ground that the indictment is fatally defective, the defendant is estopped to urge that the judgment so procured by him is a bar to a second prosecution under another indictment for the same offense."

In the case of Stewart v State, 15 Oh St, 155, the Supreme Court of Ohio held:
"The plaintiff in error, defendant below, was put on trial for a penitentiary offense. After a jury had been impanelled and sworn, a juror arose in open court and stated that he had been one of the grand jurors by whom the indictment had been found. Pertinent inquiries had been open-

ly made upon this subject by counsel for the state, before the jury was sworn, to which the juror had failed to respond. The defendant's counsel, thereupon, in answer to an inquiry by the court, objected to proceeding in the trial with the jury then impanelled, at the same time declining to waive any of the defendant's rights. The jury was thereupon discharged by the court, and another jury was impanelled in the usual mode, and the trial proceeded, the defendant objecting thereto. Held—That the discharge of the jury first impanelled was the necessary result of sustaining the objection interposed by the defendant himself, and so did not take place without his consent, but was an act done at his own instance, and would not therefore operate as an acquittal, nor bar a further prosecution."

In the opinion in the last cited case, at page 159, the court says: "Such action, taken without his consent, would operate as an acquittal, and be a bar to any further or subsequent prosecution for the same cause. To hold otherwise, would be to contravene the constitutional guaranty against being twice put in jeopardy for the same offense. * * * But, there is no doubt, that the jury might have been discharged at the defendant's instance, or by his consent, without affecting the right of further prosecution on behalf of the state."

In 3 Ruling Case Law, 153, after stating the general rule where an indictment is quashed at the instance of the defendant, though after jeopardy has attached, he cannot thereafter plead former jeopardy when placed on trial on another indictment for the same offense, it is said: "His action in having the indictment quashed constitutes a waiver of his constitutional privilege."

Carroll v State, 50 Tex. Crim., 485, 98 SW, 859, 123 Am. St. Rep., 851, 14 Ann. Case 426, and note; State v Lloyd, 152 Wis., 24, 139 NW, 514, Ann. Cas. 1914C, 415.

From 16 Corpus Juris, 241, we cite:
"(Section 376) 4. Invalid or Defective Indictment, Information or Complaint—a. In General. Subject to the qualifications hereafter stated, the general rule is that, in order that jeopardy may attach, there must be a valid indictment, information, or complaint. Therefore, where the grand jury finding the indictment is illegally organized, or some of its members are incompetent, and the indictment is for that reason invalid, a trial based upon it will not bar a subsequent prosecution for the same offense. * * *

"(Section 377) b. Acquittal. In accordance with the general rule above stated, it generally has been held in England that an acquittal upon an indictment so defective that, if it had been objected to at the trial, or, by motion in arrest of judgment, or by writ of error, it would not have supported a conviction or sentence, is insufficient to support a plea of former acquittal; and this rule has been followed generally in the United States."

From 16 Corpus Juris, 146, §388:

"As a general proposition where an indictment is quashed or dismissed as being insufficient, or where a demurrer is sustained, and accused is therefor discharged, there is no such jeopardy as will bar a prosecution on another indictment for the same offense. So where accused has secured a decision that the indictment is void, or has been granted an instruction based on its defective character directing the jury to acquit, he is estopped when subsequently indicted to assert that the former indictment was valid. In such case there may be a new prosecution, whether the indictment in the former prosecution was good or bad."

The general principle is also stated in 12 Cyc., 266.

In United States v Jones, 31 F., 725, it was held in the third paragraph of the syllabus as follows:

"Neither by common law nor by our constitution will a conviction upon a void proceeding or indictment, when the penalty has not been inflicted, operate as a bar to a subsequent indictment for the same offense."

We find and hold that former jeopardy did not exist in the case at bar.

We next come to consider the claim of error in the trial court in the admission upon the trial under the second indictment of the evidence given by certain witnesses upon the former trial under the first indictment. The Ohio statute, §13444-10, GC, in that respect is as follows:

"Testimony taken at an examination or a preliminary hearing, at which the defendant is present, or at a former trial of the cause, or taken by deposition at the instance of the defendant, or the State, may be used whenever the witness giving such testimony shall have died, or could not for any reason be produced at the trial; or whenever the witness has, since giving such testimony, become incapacitated to testify. If such former testimony is contained within a bill of exceptions, or authenticated transcript of such testimony, it shall be proven by the bill of exceptions, or transcript, otherwise by other testimony."

The first indictment returned by the grand jury of Trumbull County at the September term, 1934, having, on motion of the defendant, been found void and quashed by the Common Pleas Court, it is the claim of counsel for defendant that there never was any indictment, arraignment, plea, trial, or conviction of the defendant, and that all proceedings under the void indictment were a nullity, and hence the admission of the testimony given by Ernest Baugh, Flossie Parham and Clinton Parham at the trial under the former indictment was inadmissible under the provisions of §13444-10, GC, and that the admission of such testimony was prejudicial to the defendant. There is no denial of the fact that Ernest Baugh, who testified upon the former trial, has deceased before the second trial, and there is no denial of the fact that Flossie Parham and Clinton Parham could not be produced at the trial because of a fatal illness with which each was afflicted at the time of the second trial. It is claimed that if this court should hold, as it does, that defendant was not in jeopardy upon the first indictment because the same was void, that we are, therefore, compelled to hold that this testimony was inadmissible, the sole ground of this claim being that there could be no trial upon a void indictment. It must be remembered, as hereinbefore stated, that the accused had the election to waive the constitutional provisions for the violation of which the indictment was quashed by the trial court. Ernest Baugh, the deceased witness, was separately indicted for the same crime by the same grand jury at its September Term 1934. Ernest Baugh was likewise of the negro race. He made no objection to the indictment, but plead guilty thereto, was sentenced to life imprisonment under said indictment by the trial court, was committed to the penitentiary of the state where he remained during the period of his life, thus having paid the full penalty imposed upon him.

It seems apparent that if upon the first trial the defendant had been acquitted, he would not be here claiming that such trial was a nullity because of the fact that he could have elected to have the same quashed because of the violation of the equal

rights provision of the Fourteenth Amendment to the U. S. Constitution. This amendment being for his benefit, the state could not have been heard to claim that the indictment was void, nor could the state again have put him upon trial for the same offense under a valid indictment returned subsequent to the verdict of acquittal. It seems thus apparent that to hold that the first trial was not a trial merely because of the election of this negro defendant would, as stated above, subvert the very purpose of the Fourteenth Amendment and make of it not a guarantee of equal rights but a guarantee of superior privileges for the member of the negro race.

From the decision of the United States Supreme Court in the case of Norris v Alabama, 294 U. S. 587, 55 S. Ct., 579, 79 L. Ed., 1074, it is held that the action of a state through its legislature, courts or executive or administrative officers, in excluding all persons of the African race, solely because of their race or color, from serving as grand jurors or petit jurors in the criminal prosecution of a person of the African race, denies such defendant the equal protection of the laws, contrary to the Fourteenth Amendment. From this decision we take it that no one can complain of the deprivation of his guaranteed equal protection under the laws except the person prejudiced thereby. While the question is one upon which the courts have not been entirely in accord, we think the better authority holds to the position that notwithstanding the second trial be under a new indictment bearing a different number, the crime and defendant being same, the case is the same as regards admission of testimony given at former trial. This was expressly held in Colbert v State, 119 Texas Crim. Rep., 394, 43 SW (2d), 1099.

In the case of Shaw v United States, Circuit Court of Appeals of the Eighth Circuit, 1 F. (2d), 199, it is held in the syllabus:

"The testimony of a witness given on a former trial, but who had later died, held admissible on a second trial of defendant for the same offense, though under a new indictment; the first indictment having been held defective."

From 22 Corpus Juris, 427, §510, we read: "When, as frequently happens, it is impossible to produce on a trial evidence which was introduced at a previous trial, the former evidence is received from the necessity of the case, provided of course, that it is relevant and material on the later

trial, * * *. The evidence may be received, although the former action was abandoned, dismissed, or terminated by a non-suit."

In the case of Lapof v Rigerman, 214 N. Y. Supp., 81, 126 Misc. Rep., 569 (Circuit Court, Appellate Term), it was held: "Dismissal of case at trial for lack of jurisdiction is a 'trial' within Municipal Court Code. * * *."

In the case of State v McManis (Circuit Court of Kansas), 129 Kan., 376, 282 P., 588, it was held that testimony of an absent witness given at a preliminary examination to determine whether defendant should be held, on a charge of attempt to bribe, was properly read in evidence in a liquor prosecution against the same defendant upon the theory that the identical subject was under investigation in both proceedings.

This case goes farther than our own statute upon the subject but recognizes the reason for the admission of testimony of this character. There is much reason for the rule permitting testimony of this nature to be admitted even though the accused is being tried upon a new indictment but for the same offense. The accused has met the witness face to face. He has had the opportunity to cross examine. There is as much safeguard thrown about the taking of the testimony as in the case where the deposition of a witness is taken in a criminal case under the provisions of our code.

There is in this case some claim that the record does not show that Ernest Baugh was sworn upon the first trial. It may be said that there is nothing in the record to show that Ernest Baugh was not sworn upon the first trial. His testimony was received by the court and is contained in the verified bill of exceptions, and it is presumed, in the absence of proof to the contrary, that the procedure was regular, and so it is presumed that Ernest Baugh was sworn as provided by law.

It was held in Myers v State, 112 Neb., 149, 198 NW, 871, that proof that an absent witness gave testimony at a former trial justified an inference that he was sworn.

We find no merit in the claim that the defendant was prejudiced because the indictment was filed and docketed on the criminal docket of the Common Pleas Court under the same number as the first indictment. We fail to see how this could pre-

judice the defendant since we have found that the defendant can not avail himself of the plea of former jeopardy because the first indictment was quashed on his own motion.

The members of this court thus find ourselves in accord with the legal propositions hereinbefore discussed, and we now come to a consideration of the claim urged by counsel for plaintiff in error that the verdict is manifestly against the weight of the evidence. We find ourselves unable to unanimously agree upon this proposition and it follows that the judgment of the trial court can not be reversed on the weight of the evidence in view of the constitutional provision which limits the right to reverse upon that ground except upon the concurrence of all three members of the court, but the majority members of this court find the verdict of the jury so flagrantly against the weight of the evidence in this case that we look to the Constitution of our State, fixing the jurisdiction of this court, for our authority to relieve against what we consider to be a manifest miscarriage of justice, so manifest that the verdict of guilty without recommendation of mercy carrying with it a sentence of death can, in our opinion, be ascribed to no other reason than the intense feeling existing in the community due to the fact that one of the citizens of the city of Warren, much respected and deeply revered, lost his life by reason of the unfortunate occurrences which give rise to the prosecution; and also due to the fact that the community had been stirred deeply by another murder committed in the city of Warren about the same time, and for which the same grand jury which first returned the indictment in this case also returned another indictment for murder in the first degree, the trials in each case resulting in a conviction and sentence of death and in both cases the judgment of the trial court was required to be reversed upon error to this court, and wherein the Supreme Court, on motion to certify the records, had overruled such motions. We can appreciate this feeling of the citizens of Warren and Trumbull County, but we can not let this deter us in the performance of what we believe to be our plain duty, and we do not hesitate in our decision to modify the judgment of the trial court and to affirm such judgment as modified. Under the Constitution of the state, the Court of Appeals is vested with jurisdiction to review, modify, affirm or reverse the judgment of the Common Pleas Court. The limit upon the jurisdiction so granted to the Court of Appeals is to the effect only that this court can not reverse the judgment of the Common Pleas Court upon the weight of the evidence except upon the concurrence of all the members of this court. █ There is no such limitation upon our right to modify the judgment of the Common Pleas Court upon the concurrence of two members of the court.

In the case of **Campbell v Campbell, 128 Oh St, 590, 193 NE, 405**, the Supreme Court of the state has declared, as follows: "The terms 'modify' and 'reverse,' as used in §6 **of Article IV of the State Constitution,** are distinguishable."

Since there is no limitation upon the right of this court to modify a decision of the Court of Common Pleas upon the weight of the evidence by the concurrence of but two members of the court, we proceed to analyze the evidence in this case, and from such evidence to modify the judgment to conform to the facts proven upon the trial, it being our conclusion that there is no evidence in the record from which the jury were warranted in returning a verdict of murder in the first degree. We have carefully read and considered the record in this case from which it appears that LeRoy Keith, who was 20 years of age at the time of the offense charged in the indictment, and Ernest Baugh, who was 18 years of age at that time, had lived for several years in the city of Warren and had attended the public grade and high school of that city where they became acquainted, and that a friendship had grown between them to the extent that Baugh visited in the Keith home and at times stayed in the Keith home over night. Upon one of the occasions when Baugh stayed over night at the Keith home, about two weeks before the offense charged in the indictment, Keith asked Baugh if he knew any places where he could get some easy money, and Baugh mentioned a couple of places up in the north end of Warren, and Keith asked Baugh if he wanted "to pull the job with me," and Baugh said, "I don't care, like that." Upon inquiry by Keith, Baugh told him how he would do the job if it were he. Keith stated that if they were going to do it they would need a car, to which Baugh protested and testified that they couldn't come to an agreement on getting the car and Keith didn't say anything more about it until just immediately before they came to the scene of the homicide.

Baugh testified that the place where they were planning to get the money was at a

beer garden on Park Avenue in the north part of Warren, both of the young men living at the time in the southern part of the city. Baugh testified that he told Keith about this beer garden and told him that they could "stick the fellow up" as he came out to go home, as he always came out and got the last bus going home. Keith and Baugh went to the beer garden once or twice before July 24, 1934, Baugh testifying that about a week before July 24 he saw a gun in Keith's possession which looked like the one offered in evidence by the state but that he couldn't tell positively whether it was the gun Keith had, but that the gun Keith had was marked on both sides with certain etchings of the same design as the gun offered in evidence. Both of these boys lived on Franklin Street in the southern part of the city of Warren, between Park Avenue and Pine Street, and on the night of July 24, 1934, they met at the home of one Money Jackson on Clinton Street on the south side of the city. There Keith and Baugh talked, Keith asking Baugh if he had any money to go to the dance the next night, and upon Baugh telling him that he had no money, Keith said, "What about pulling the job you was telling me about, up in the north end, and I said all right." No other talk was had between the two concerning the "job" which they were going to pull in the north end until the two were walking north on Pine Street when Keith said to Baugh, "So you aren't going to get a car?" and Baugh told him, "No, it would be bad enough if we got caught for robbery, then we have two charges against us"; Keith said, "You know I can't take any chances, because I am out on parole, any way we won't get anything over three or four dollars." Baugh told Keith, "If you want to do the job like I said, all right, if you don't it is off." Keith said, "If you help get a car, I know two or four other places we can pull along." Baugh told Keith he wasn't going to get mixed up in any car stealing and then Keith "acted like he didn't want to go."

The only witness who testified as having any actual knowledge of the further occurrences leading up to the killing of Fred Griest is Ernest Baugh, who was called as a witness by the state and who is the same Ernest Baugh against whom the grand jury of Trumbull County, at its September term 1934, returned a separate indictment for murder in the first degree in the killing of Fred Griest. The following is the verbatim testimony as shown by the bill of exceptions taken in the first trial and read to the jury in the second trial, and is a narrative of the occurrences next after

Baugh and Keith had the conversation above related, while walking north on Pine Street to the intersection of Market Street, about fifty feet east from which point Fred Griest was shot and killed.

"Q. Did you do anything then by way of attempting to get a ride up in the north end of town? A. Well, not right then; we walked on up, on up the street.

"Q. Were you looking for anyone? A. No, not at the present time.

"Q. Did you attempt to find anyone who had an automobile, to take you up to the north end of town? A. Well, we was about ten yards from Market Street, I said let us stop here a while, and maybe we can get a ride, with Walter Rogers, and he will keep us from being seen.

"Q. Who is Walter Rogers, by the way? A. He is a colored lad and lives on the north end of town.

"Q. And had a car, did he, of his own? A. Yes, his uncle's car.

"Q. Did he usually come, or did he ever come around that part of town in his car? A. Yes.

"Q. When you got to the corner of Pine and Market, will you tell the jury just what happened there? A. Well, we started across, we was right at the curb, to go across the street, and he said, 'wait a minute, I think I know this fellow down here,' and he called this peculiar name.

"Q. Just one moment; you say you came up Pine Street, Ernest. A. Yes.

"Q. And then you say just as 'we started to cross the street'? A. Yes.

"Q. Now, what street do you mean? A. Market Street.

"Q. And which side of Pine Street did you go on? A. Was on the east side of Pine.

"Q. And did you start to cross directly to Market Street, directly opposite from where you came up Pine Street? A. Yes.

"Q. Then what was it LeRoy said to you, at that point? A. He said, 'Wait a minute, I think I know this fellow down here,' and he called a name, 'I will see if I can get him to drive us out there.'

"Q. Then, when he said that, what did he do? A. He turned and walked down to Market Street.

"Q. On which side of Market Street was it? A. It was on the south side of Market.

"Q. And that down toward the furniture store, and Gillen's undertaking establishment? A. Yes.

"Q. Did you, yourself, see anyone down there, seated in a car, at that time? A. No.

"Q. And what did you do, Ernest? A. Well, I followed him.

"Q. And then tell the jury what you observed LeRoy doing. A. Well, when he got to the car, walked around in back of it, went around to the driver's seat, and I stopped alongside of the car.

"Q. In other words, as he walked down along the street you say he turned back of the car? A. Yes.

"Q. You mean by that he went out into the street? A. Out into the street.

"Q. Then he followed along on the street side to where the driver was seated at the wheel? A. Yes.

"Q. And you went along the side of the car, on the sidewalk? A. Yes.

"Q. Did you notice what LeRoy did, when he went around on the outside of the car? A. Well, him and the fellow was talking.

"Q. Did you hear any of their conversation? A. No, I couldn't understand what they was saying.

"Q. And what did you do? A. Well, I stood there a while, then I stuck my head in the window, to ask Keith whether he was going to take us up there or not.

"Q. And that, which window is that you refer to? A. That is on the outside of the car, next to the street.

"Q. On the side next to the sidewalk; you put your head in that window? A. Yes.

"Q. Did you hear any of the conversation between Keith and the man who was seated in the car? A. No, I didn't.

"Q. About how long were you standing there in that position, before you noticed anything else happened? A. Well, as soon as I stuck my head in the window he jerks the door open, and had this gun in his hand.

"Q. Who jerked the door open? A. Keith.

"Q. You say he had a gun in his hand? A. Yes.

"Q. In which hand? A. Right hand.

"Q. And did he have the gun pointed at anyone? A. Had it pointed at the man.

"Q. Did he say anything at that time, when he jerked the door open? A. He ordered him to get out.

"Q. Was that when he said 'get out'? A. Yes.

"Q. What did the man do or say? A. Well, he hollered, and throwed up his hand.

"Q. You say he hollered? A. And threw up his hand.

"Q. And threw up his hands? A. Yes.

"Q. Do you know what he said, if he said anything, when he hollered? A. Well, he hollered, hollered.

"Q. When he threw up his hands where were you? A. My head in the window.

"Q. Did you have a hat on that night, Ernest? A. Yes.

"Q. Showing you a hat marked State's exhibit one, I ask you to look at that, and tell the jury if you know whose hat that is. A. Well, as he threw up his hand he knocked my hat off.

"Mr. Buchwalter: What is that? A. As he threw up his hand, he knocked my hat off.

"Mr. Secrest: No, just answer the question, I want you to take a look at this hat, look it over carefully, and tell the jury if you can whose hat that is. A. That is my hat.

"Q. It is your hat; you say that when the man in the car threw up his hands, he hit your hat? A. Yes.

"Q. And knocked it off in the car? A. Yes.

"Q. Is that the hat that was knocked off in the car? A. Yes.

"Q. Did you hear a gun explode that night at that place? A. Yes.

"Q. Can you tell the jury what happened just at the time the gun exploded? A. Well, as he ordered the man to get out, and he threw up his hand and hollered, Keith took a quick glance back over his shoulder, and turned to run, and Griest reached out with right hand, with his left hand, and gripped the gun.

"Q. Did you notice how he gripped the gun? A. Well, like this.

"Q. And, just in that fashion he grabbed hold of the gun, up on the barrel? A. Yes.

"Q. And was the gun, at that time, pointed at him, or away from him? A. It was pointed at him.

"Q. And when Mr. Griest grabbed hold of the gun like that, what happened then? A. The gun went off.

"Q. Then what happened? A. Well, Keith run around in front of the car, into Gillen's Funeral Home, through the yard, and I followed him."

We have thus fully set out all of the testimony in this case which we can find in this record from which the jury must determine the degree of the crime of which the defendant, Keith, was guilty. No witness other than Baugh testifies to the occurrences leading up to the actual shooting. Other witnesses testified to hearing the shot, and seeing two persons run from the scene but these persons were not at the time identified by the witnesses, and subsequently identification was established through the hat left by Baugh in the bottom of the Griest car. Thus we find from the evidence that neither of the two men

indicted for the murder of Griest had planned to rob him or to steal his car, or even expected to see him upon the occasion of their going to the north end of Warren to rob the proprietor of the beer parlor. The testimony of Baugh is to the effect that Keith went to the car in which Griest was sitting for the expressed purpose of seeing if he could get Griest to take them to the north end of the city in his car. Although Baugh was on the sidewalk adjacent to the Griest car, the window of the car being open, Baugh heard no threats nor loud talk upon the part of Keith, and evidently had no idea that any crime was about to be committed. On cross-examination Baugh reiterated his story as above outlined, but further stated that the whole occurrence took but about thirty seconds from the time Keith arrived at the side of the Griest car and started to talk with Griest until the shooting had taken place. As testified by Baugh, he put his head in the window on the side of the automobile next to the sidewalk for the purpose of asking if the man was going to take them up to the north end of town. Up to that time he had not seen any gun and had heard none of the conversation between Keith and Griest, or anything to indicate an intention upon the part of Keith to commit any assault upon Griest or to steal the Griest car, and after he put his head in the car he did not have time to ask the question which was in his mind, Keith immediately jerking the door open and pointing the gun which he held in his right hand at Griest and ordering Griest to get out of the car. Instead of getting out Griest immediately "hollered," threw up his right hand knocking Baugh's hat off, and with his left hand grabbed the gun. At that time Keith looked over his shoulder and turned to run, then the gun went off, killing Griest instantly.

It is apparent to the majority members of this court from this testimony that the only purpose of Keith in jerking open the door and pointing the gun and ordering Griest out of the car was to unlawfully obtain possession of the car without any purpose or intent to kill Griest, otherwise Keith would not have ordered Griest out of the car and would not have turned to run immediately upon Griest "hollering," and before the shot was fired.

It appears to us from the only evidence in the record that Keith abandoned the intent to steal the car upon the unexpected event of Griest "hollering" and when Griest grabbed the gun it was instantly discharged while Keith was in the act of running

from the car. Under these circumstances we think that the jury, in the exercise of their duty to give Keith the presumption of innocence and to resolve all reasonable doubts in favor of his innocence, might properly have arrived at a verdict finding Keith guilty of manslaughter, which is the unintentional killing of another without malice, when the slayer is in the commission of some unlawful act, or the intentional killing upon a sudden provocation.

An explanation of the failure of the jury to find the defendant guilty of manslaughter, that is that the defendant unlawfully killed Fred Griest while defendant was engaged in the commission of an unlawful act, may be found in the fact that the trial court erroneously charged the jury as follows:

"The court says to you as a matter of law, that if you find and believe, from the evidence, that at the time of the alleged killing, the defendant opened the door or the decedent's automobile, then occupied by and in the possession of the decedent, and ordered him to get out, for the purpose of robbing the decedent of his automobile, and that in the prosecution of that purpose, the defendant shot the decedent, and thereby caused his death, then such killing would not be the offense charged in the indictment in the absence of other evidence, but murder in perpetrating or the attempt to perpetrate a robbery, and in such event you should find the defendant is not guilty."

This charge, in effect, precluded the jury from rendering a verdict of manslaughter, and except for the fact that this erroneous proposition of law was given to the jury at the request of counsel for defendant below, would have necessitated the reversal of this case. True, the indictment did not charge murder in the first degree while the defendant was perpetrating or attempting to perpetrate robbery, but did charge the defendant with murder in the first degree in that the defendant purposely and of deliberate and premeditated malice killed Fred Griest. The former verdict of murder in the first degree, under an identical indictment, was set aside by this court on error for the reason that the court then charged the jury that they might find the defendant guilty of murder in the first degree if they found from the evidence beyond a reasonable doubt that Keith purposely killed Fred Griest while in the perpetration or attempt to perpetrate robbery, although he was not so charged in the in-

dictment. But this court did not lay down in that error proceeding any such proposition as that the defendant could not be convicted of killing Fred Griest purposely and of deliberate and premeditated malice while defendant was robbing or attempting to rob Fred Griest of his automobile. The purpose to kill of deliberate and premeditated malice may exist where the accused is engaged in the perpetration or attempt to perpetrate any crime. The only purpose of the statute in defining one kind of murder in the first degree to exist where one person purposely kills another while perpetrating or attempting to perpetrate certain felonies, to-wit: rape, arson, and robbery, is to render it unnecessary that the State in such cases prove the killing to be of deliberate and premeditated malice. In all cases, whether or not in the perpetration or attempt to perpetrate some crim,e, where the killing is done purposely and of deliberate and premeditated malice, the crime is murder in the first degree.

The charge of the court in the first trial of the defendant, permitted the first jury to find the defendant guilty of murder in the first degree without finding that the defendant had killed Fred Griest purposely and of deliberate and premeditated malice.

It is conceded upon the argument of the present error proceeding that without the testimony of the accomplice, Ernest Baugh, the state must fail in its effort to convict anyone other than Ernest Baugh for the commission of the deplorable crime which cost Fred Griest his life, and we believe we are justified in holding that the testimony hereinbefore set out, given by the accomplice, Ernest Baugh, is the only testimony from which the jury in this second trial could find the degree of the crime committed. The trial court properly charged the jury in this case that they might find the defendant guilty of murder in the second degree if it should find from the evidence beyond a reasonable doubt that the defendant had purposely and maliciously killed Fred Griest, without deliberation and premeditation, and this court recognizes the rule that where there is credible evidence from which the jury may arrive at its verdict, the Court of Appeals may not substitute its judgment for that of the jury unless the verdict is manifestly against the weight of the evidence. As stated, intent to kill and malice must be established in order to convict of murder in the second degree, but the proposition of law has long been established in Ohio that malice, as here understood, simply means the wil-

ful design to do another an unlawful injury, an intentional killing without legal justification or excuse; and where a wilful killing has been proved, a presumption arises that simple malice was present, and consequently that the crime is murder in the second degree.

In determining whether the killing of Fred Griest was wilful, that is, intentional, the jury may look to all the circumstances shown by the evidence, and in that connection they properly took into consideration that the accused had, previous to the killing, armed himself with a deadly weapon, one calculated to produce a mortal wound, and the further fact that Keith pointed this deadly weapon at Fred Griest. We recognize that it is rarely ever possible to show the workings of a man's mind except in cases involving a confession of guilt, and it follows necessarily that proof of intent to kill must be ascertained by a consideration of all the circumstances shown to exist at the time of the killing, and since the court had given, at the request of defendant's counsel, the erroneous charge hereinbefore set out, and by reason of which request the defendant can not claim that the error of the court was prejudicial to him, we conclude that the jury might, under all the circumstances shown in this case, have properly arrived at a verdict of murder in the second degree, but that the facts and circumstances shown in this case upon a fair consideration of all the evidence would not warrant the jury in finding beyond a reasonable doubt that the defendant purposely and of deliberate and premeditated malice killed Fred Griest.

"There must be facts shown from which deliberation and premeditation may be inferred, and it has been held that the inference of deliberation and premeditation must be more reasonable than any other inference. The jury can not be allowed to guess on this important element. A presumption of deliberate and premeditated malice is not to be inferred from evidence of an intentional killing without more. * * * There must be reflection and planning for some time, however short. The determination must be cool and deliberate, not formed upon a sudden impulse, but in the exercise of clear reason." **21 Ohio Jurisprudence, 44.** See also **Dodig v State of Ohio, 16 O.C.C. (N.S.), 311, 31 C.D., 507.**

But there must be facts shown from which deliberation and premeditation may be inferred: the jury can not be allowed to guess; and we find no such facts in the

record. The actual existence of such deliberation and premeditation must be proven beyond a reasonable doubt. In this case there is no such proof as to warrant the jury in finding beyond a reasonable doubt that the defendant killed Fred Griest of deliberate and premeditated malice.

We have carefully and conscientiously considered all of the evidence shown by the record in this case, and ▮▮▮▮▮ find and hold that the judgment of the Common Pleas Court must be modified to conform to such evidence, and the case is so modified to the extent that the degree of the crime committed by LeRoy Keith be fixed and determined at murder in the second degree, and the judgment of the Common Pleas Court, as so modified, is affirmed.

For our further authority in this respect, we quote the provisions of §13449-1, paragraph 4, GC:

"That the verdict is not sustained by sufficient evidence, or is contrary to law; but if the evidence shows the defendant to be not guilty of the degree of crime for which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict or finding accordingly, without granting or ordering a new trial, and pass sentence on such verdict or finding as modified, and this power shall extend to any court to which the cause may be taken by proceedings in error."

We also cite the 5th paragraph of the syllabus of the case of **Turk v State, 48 Oh Ap, 489, (17 Abs 522), 194 NE, 425,** wherein it is held:

"Court of Appeals held authorized to modify degree of crime included in verdict ·returned by jury (§13449-1, Paragraph 4, GC; Article IV, §6, Constitution)."

Affirming the judgment of the Common Pleas Court as herein modified, and without granting or ordering a new trial, it is ordered that the former sentence of death imposed by the Common Pleas Court be set aside and the defendant brought before this court on Thursday, March 12, 1936, at 10 o'clock A. M. for sentence according to law for the crime of murder in the second degree.

Judgment modified and affirmed.

ROBERTS, J, concurs.
CARTER, J, dissents.