QUEEN CITY PRINTING AND PAPER COMPANY v. McADEN.

(Filed October 21, 1902.)

1. CONTRACTS—*Fraud—Subscriptions—Corporations.*

The evidence in this case is sufficient to be submitted to the jury on the question whether the subscription for stock was induced by fraud.

2. PLEADINGS—*Answer—Waiver—Demurrer—The Code, Sec. 248.*

The defect of the answer, setting up the defense of fraud, from failure to allege the knowledge of the plaintiff of the fraud, is waived by failure of plaintiff to demur.

ACTION by the Queen City Printing and Paper Company against Henry M. McAden, heard by Judge *H. R. Starbuck* and a jury, at January Term, 1902, of the Superior Court of MECKLENBURG County.

This action is brought to recover the amount ($500) subscribed by defendant for ten shares of stock in plaintiff company. Defendant resisted a recovery upon the grounds (among others not necessary now to be stated or discussed) that plaintiff, through its agent and president, H. A. Murrill, induced the subscription by false representations. Upon the trial, the defendant in his own behalf testified that:

"Between the 16th and 20th of April, 1900, Mr. Murrill came to me with the subscription list introduced in evidence. He had other papers with him, or at least told me he had, but I did not see them. He told me that he and J. P. Wilson and George B. Hiss and others had been talking about reorganizing the Queen City Printing and Paper Company, and wanted me to help him; that he, J. P. Wilson, E. A. Smith and George B. Hiss had agreed to take most of the stock, and would take it all, but wanted a few outsiders for their influence, and that George B. Hiss had recommended and sent him to me. He said George B. Hiss would be treasurer of the company, and that George B. Hiss, J. P. Wilson and E. A. Smith would be large stockholders, and that George B. Hiss would be actively in charge of the financial part of the business. I said to him, I don't know anything about your business, but if George B. Hiss is going to be a stockholder and manage the thing, and I can be of any assistance to you, I will be glad to take some stock. I suppose you want only a small subscription. I will subscribe for three shares, or $150. He said, 'You might as well make it $500.' I replied, 'Well, if George B. Hiss is going to be interested and manage this concern, and asks for my help, we will make it $500.'" I then signed my name for $500. At that time

George B. Hiss and I were associated in a number of business enterprises, and we had been accustomed to help each other out. If Mr. Hiss wanted help, I would help him, and *vice versa*. Mr. Murrill told me that Mr. Hiss had sent him to me. I said to him, 'Why is it that Mr. Wilson and Mr. Hiss have not subscribed?' He said, 'They haven't subscribed their names, because they expect to take whatever stock is left, and don't know now what to put down,' and he further said that Wadsworth and Franklin had authorized him to put their initials on the list, but had not signed themselves because they were constantly being solicited to take stock in companies and didn't want everybody to be bothering them, but that they were going to be stockholders in the company.

"Mr. Hiss is a splendid business man, and I had absolute confidence in him. When Mr. Murrill came to see me, he stated that he knew I had great confidence in Mr. Hiss.

"I told Mr. Percy Thompson what I have told here.

"Some time before the meeting, which was held on the 26th of April, 1900, Mr. Murrill came back to see me and said: 'It may be Mr. Hiss is so busy in other matters that he can't become treasurer. Would some other good man do for treasurer?' I said, 'Any reliable man that the stockholders may agree on for treasurer will be satisfactory to me.' He then said, 'Would Mr. D. W. Oates do?' and I replied, 'If Mr. Oates is satisfactory to a majority of the stockholders, as treasurer, he will be satisfactory to me.' He showed me a paper from Mr. Oates, stating that he would accept the position. I then said to him 'Well, what about Mr. Hiss?' He said, 'He is a stockholder, and will give it as much of his time as his business will permit, and will be interested in the management of the company.' I then said to him, 'I take the stock on account of my friendship for Mr. Hiss, and because it has been represented to me that he wanted me to take it.' This representation was what had caused me to sign the sub-

scription list. I told Mr. Murrill of my friendship for Mr. Hiss, and of the different things we were interested in together. Mr. Murrill told me that the corporate stock of the re-organized company was to be $15,000; that he did not want a large subscription from outsiders, because Mr. Smith, Mr. Wilson and Mr. Hiss expected to be large stockholders. Mr. Wilson and Mr. Smith are highly successful business men.

"The main reason why I signed the subscription list was because Mr. Murrill stated to me that Mr. Hiss was going to be a large stockholder and take an active interest in the company, and I was willing to intrust my money in the enterprise on account of my confidence in Mr. Hiss.

"Afterwards I had a conversation with Mr. George B. Hiss and Mr. J. P. Wilson. In consequence of what they said to me, I went and saw Mr. Murrill before the meeting, which was held on the 26th of April, and stated to him that things had been misrepresented to me, and that Mr. Hiss had told me that he was not a stockholder, and had never intended to be, and had not suggested Murrill's going to see me, and would have nothing to do with the management of the concern. I told Mr. Murrill that I withdrew my subscription. I got the notice of the meeting of the 26th of April, 1900, after this conversation with Mr. Murrill. After the notice, and on the day set for the meeting, I went to see Mr. Murrill again, and repeated to him what I have just stated, adding that I was not liable on the subscription and would not come to the meeting. It was stated in the notice that the meeting would be held for the re-organization of the company on the 26th of April, 1900. Mr. P. M. Thompson was with me when I had the last conversation with Mr. Murrill. Mr. Murrill didn't deny what I said, but said to me, 'I am not in a position to release you, and it will break up the whole thing if you drop out.' He said, 'You come to this meeting, and I will find a way, afterwards, to take the stock off your hands.'

I said to him, 'If I come to your meeting, I will make it so
hot for you that I had better stay away.'

\*   \*   \*   "My refusal to go into the company was be-
cause of the representation that Mr. Hiss was going to be a
stockholder and actively interested in the business.   The fact
that this representation was not true was the reason that I
refused to go into the company."   \*   \*   \*

The case on appeal states that "Upon the conclusion of the
evidence, the Court ruled that the representations which de-
fendant McAden testified had been made to him by Murrill,
were insufficient to invalidate McAden's subscription to the
stock upon the grounds as contended by defendant, that said
subscription was induced by said representations, were false
and constituted a condition to the subscription which had not
been complied with, and that the jury would not be permitted
to consider said representations for the purpose of finding the
subscription invalid upon the grounds aforesaid," to which
defendant excepted.   There was a verdict for plaintiff; mo-
tion for new trial refused, and defendant appealed.

Defendant contends that the evidence of defendant must
be taken as true, as the Court ruled it out upon the ground
that it was insufficient in law to establish any defence to the
plaintiff's claim.   And assuming that the subscription of
McAden was induced by the false representations that Hiss
had agreed to become a stockholder and to take an active part
in the management of the business of the company, and that
plaintiff's agent had been sent by it to defendant to request
him to take stock, then such representations were material,
and that the Court erred in its ruling.

Plaintiff contends that this evidence was immaterial and
insufficient to invalidate the contract of subscription, and that
its consideration was properly excluded by the Court upon
the grounds that the allegations in the answer do not state
facts constituting fraud, in that they do not allege that the

falsity of the representations was known to plaintiff, and insist that it was necessary for defendant to have *alleged* and *proved* the same.

From a judgment for the plaintiff, the defendant appealed.

*C. W. Tillett,* and *T. C. Guthrie,* for the plaintiff.
*Burwell, Walker & Cansler,* for the defendant.

Cook, J., after stating the case. From the ruling of his Honor we understand he held that, taking McAden's evidence to be true, it was immaterial and insufficient to make out such a case of fraud as would rescind the contract of subscription, and in this we think there was error.

To constitute the fraud, there must have been a representation, express or implied, false within the knowledge of Murrill, reasonably relied on by defendant, and constituting a material inducement to the contract. Adams' Eq., 177.

From the evidence of McAden, it clearly appears that the representations made to him by Murrill, and upon which he relied, were false; that they were material to the inducement, for otherwise he would not have signed the subscription list. The nature of the transaction shows that Murrill was speaking as of his own knowledge ("Murrill told me that Mr. Hiss had sent him to me"; "he (Hiss) is a large stockholder"; "I went to see Murrill again and repeated to me what I have just stated. * * * Murrill did not deny what I said"), and therefore the falsity of the representations must have been known to him. If this be so, then the subscription was induced by fraud, and voidable at the option of defendant, which he promptly repudiated without laches. Clark on Corporations, 283 et seq; 1 Cook on Stock and Stockholders and Corp., Sec. 151 and 161; *Henderson v. Lacon,* Law Reps. 5 Eq. Cases (1867-'8), 248; *Ross v. Estates Investment Co.,* 3 Law Rep., 682. The contention of plaintiff as to

the failure to allege knowledge by Murrill of the falsity, can not be sustained. It is true that such knowledge should have been expressly pleaded, for otherwise the answer would be demurrable, and the answer does not allege that Murrill knew that the representations he made were false; but plaintiff did not demur to it, as he should have done (Code, Sec. 248) had he desired to take advantage of such defects in the answer. So, we have a defective statement of defendant's grounds of defense, which must be deemed to have been waived under the principle well settled and fully discussed in *Halstead v. Mullen,* 93 N. C., 252; *Knowles v. Railroad,* 102 N. C., 59; *Ladd v. Ladd,* 121 N. C., 118; *Martin v. Martin,* 130 N. C., 27. In those cases, the exceptions were taken to defects appearing in the plaintiff's complaint, while in the case at bar they are taken to the allegations made in the answer, which sets up an affirmative defense with the burden of proof on defendant, and is subject to those rules which apply to a complaint. The facts relied upon as the basis of a defense must be set out in the answer with the same precision as is required in a complaint. *Anderson v. Logan,* 105 N. C., 266; *Rountree v. Brinson,* 98 N. C., 107. The answer expressly alleges all the facts material and necessary to constitute the fraud, except that plaintiff *knew* that his representations were untrue at the time he made them to defendant, of which no advantage was taken by demurrer. Had plaintiff demurred to the answer, stating such defect as his grounds, it could have been easily remedied by amendment (*Ladd v. Ladd* and *Martin v. Martin, supra*) had defendant been so advised.

As there will have to be a new trial, we deem it unnecessary to discuss the other questions raised in this appeal.

New Trial.