The defendant was indicted for burglary, under C. S., 4232.
Peter S. Gilchrist, Jr., a witness for the State, testified, in part: "I know the defendant, Tommie Walls, when I see him; on or about the early morning of 2nd of September, I saw him on the second floor of my father's home, at 320 E. Park Avenue, Charlotte. It was between the hours of 3:30 and 4:00 a.m., in the nighttime. I was awakened about 3:30 by hearing a noise on the second floor of my father's home, and I looked out of my bedroom door and I could see a figure moving in a room that was joined to my room by a small back hall. I listened and heard a figure in there moving and opening and closing bureau drawers, and I looked in the door and saw a figure standing at a bureau, and I ran in and got him from behind at the same time calling to my father, who was asleep on the same floor, to come to my assistance. I threw the man I had caught from behind, to the floor, and he was armed with a knife, and he cut me with it on the hand and scratched me across the stomach and then he stabbed me in the right leg. We fought on the floor for several minutes, and I obtained possession of the knife, and threw the man from me, and I had a chance at that time to see his face in the bright moonlight that was streaming through the window. About that time my father came in and asked me what was wrong and I said there was a man there, and he had an opportunity to see his face, too, in the bright moonlight. I asked my father to go to the telephone on the landing between the first and second floors and phone for the police. He went down to telephone and turned on the light half way between the first and second floors, while I stood upstairs and held this man at bay, which amounted to nothing more than him standing there beside me. When my father turned on the light I had an opportunity to see his face again. My father returned to the second floor because he had forgotten his glasses and was unable to telephone. Just as he reached the top of *Page 489 
the stairs this man pushed me to one side and ran down the stairs to the first floor and to the rear of the house where he left the house by means of an opened back window. I followed him through the back door and out through the back gate, down the alley to the next corner; we live two houses from the corner and I saw him under the street light again, but was unable to get him because of loss of blood. I returned home and dialed the police for an ambulance and the police arrived within five minutes. I would say approximately five minutes after I had dialed police arrived, before the ambulance. They asked me which way this man had gone and what his general description was, which I gave them, and then the ambulance arrived and carried me to the Presbyterian Hospital. Later, I would say 15 to 25 minutes later, the police brought a man over to the hospital where I identified him from his face and also from the fact that he had blood on his right hand and his trousers were spattered with blood. My father at this time identified him also, in my presence; this defendant, Tommie Walls, is the man who was in my father's house. The house had been closed up before we went to bed that night, windows down and doors locked; when the man ran out of the house the rear kitchen window was up, open. The defendant went out that window; I went out the door. I was sleeping in the house that night and was asleep when awakened by the noise of someone in the house; my father was also asleep in the house and my mother and nurse were also on the same floor; that is the home of my father, Peter S. Gilchrist, Sr., and I live with him, and my name is Peter S. Gilchrist, Jr. (The State offered in evidence the knife.) . . . He was standing facing me on the second floor while the light was on at the landing; while my father was going down he turned the light on and I had a chance to see his face on the second floor from the light at the landing half way between the two floors. . . . I found the knife you hand me in the possession of the man I caught in the house that morning. I did not pick it up in the room but obtained it from the man himself in the dark; I did not see the knife until I returned to the house. There was blood on the knife. . . . I was in the hospital about two or three days, and then in bed at home for another week. When father came to my rescue he got within two or three feet of the man in the room, close enough to have laid hands on him; at that time I had already gotten the knife away from him. I do not know whether my father put his hands on the man or not; I turned in the knife to the police that morning."
Peter S. Gilchrist, Sr., corroborated the testimony of Peter S. Gilchrist, Jr.
Mr. Bridges testified, in part: "I saw the defendant Tommie Walls on the morning of second, just a little after four o'clock, eight or ten *Page 490 
blocks from the Gilchrist home and he was going north away from the Gilchrist home; he had on a brown shirt, brown mixed pants, and was bareheaded and his hair sorter slicked back, but I could not say what with; it was not in the same condition it is now but was flat on his head. I stopped him and we asked him where he had been and he said to the fertilizer plant to see his father. He told us that he had been to the fertilizer plant to see his father and we took him in custody and took him back to Mr. Gilchrist's home. Chief Joyner was there and I took him to Chief Joyner and we took him to Mr. Gilchrist, the old gentleman, and he looked at him, and I do not know what he said and Chief Joyner told me to take him to the station, and I started to the station with him and got a message on the radio to take him to Presbyterian Hospital, and I had him handcuffed to my arm and took him to the hospital and let young Mr. Gilchrist and his father both see him. When we picked up Tommie Walls I noticed there was blood on the front of his pants and in his right hand; it was fresh blood. The only fertilizer plant I know about is in the other end of the city; the way he was going would be towards the fertilizer plant in the eastern part of the city. Mr. Gilchrist, Sr., identified him as being the one that was in his home. . . . At the time we arrested Tommie Walls there was a bright moon shining, just as light as could be; we did our driving with the lights off, moonlight so bright we did not need the lights on the automobile."
C. L. Sykes testified, in part: "I was with Mr. Bridges when we arrested Tommie Walls on the morning of 2 September, 1936. I first saw him at the corner of E. Morehead and S. McDowell; he was going north and away from the Gilchrist home; it was a very light night; the moon was shining very bright; we did not have the lights on our car. . . . When arrested there was blood on defendant's pants and on his right hand; there was a cut place on his right hand but at that particular time it was not bleeding and I could not say it looked like a fresh cut; there was blood on some parts of his right hand, the one that was cut; I do not recall as to any cut between the middle fingers."
The defendant denied his guilt, and testified, in part: "It was not me that young Mr. Gilchrist attacked in the room of his home; I did not cut him with any knife and the first time I ever saw this knife was when they had it in the fingerprint room and tried to make me take it. I had some blood on my finger when arrested but did not have any on my pants. The blood on my hand came from a cut on my finger right here, my middle finger; I cut it on a beer can when I laid it on the table at the beer garden on the corner or between Davis and Caldwell. When I was there that boy right there, Partee, was there too, and his brother-in-law and cousin, Lawrence Maley. At that time Maley worked at a cafe but I do not know where he is now. I left Brevard Street to get *Page 491 
me a drink of liquor. I drank some liquor at the beer garden, a full pint and a half pint; I drank the pint at the cafe and the half pint at the beer garden; then I went down on S. Brevard to Littlejohn's house on the other side of Hill Street; Littlejohn is a colored man and his place is almost right across from a laundry, and there is a church on the right-hand side from it across the street from the laundry. I do not know what church that is. When I left the beer garden it was between 12 and 1 o'clock and I was drunk, and when I came to myself I was sitting in front of the church on the steps. I do not know what time I went there but I spent the night there sitting right on those steps; when I left there I went on the other side of Brevard and turned left and came out on East Morehead; I had started home; I turned left down McDowell and went north and when the officers got me I was going north on McDowell Street, and I went that way until the officers got me; from where I woke up I went up S. Brevard to East Morehead and down East Morehead until I hit McDowell. I had not been to the Gilchrist's, and I did have a hat and the one you have in your hand is the hat I had when the officers arrested me, and that I had on when they carried me before Mr. Gilchrist on his porch. I have had it ever since, while in jail and down at the State Prison. . . . I have been in trouble before. The picture you show me is a picture of me made here in Charlotte and my hair was cut when it was made, and it was like that picture when they accused me of going in the Gilchrist home. . . . The picture was made 2 September, 1936, at City Hall, and is a picture of me made the morning after I was accused of going into Mr. Gilchrist's home, and it looks like me on that morning. My hair at that time was not as long as it is now and it was laying like it is in the picture, but there was nothing on it. The trouble I was in was for housebreaking, storebreaking, and for murder; I was tried for murder in 1932 and they sent me to Raleigh for killing Howard Moore; I went for 4 to 7 years. I was up for first degree burglary in 1926; I do not know whose home I went in then; they sent me to a training school as I was under 16; the next time I was up for storebreaking and larceny was in '31, and I got 12 months. I went into the house before midnight on the one I was sent up for and I went in through the kitchen door; I broke into the store through the door. In 1932 I was sentenced to 4 to 7 years and got out June 16, 1936. When sent to training school they had me charged with going into a number of houses and taking things; and I stayed at the training school 5 years; then I served one year on the roads. I got off the roads in July and got in trouble in September, 1932."
There was other evidence corroborating the State's evidence and contradicting that of the defendant. The defendant also introduced evidence contradicting that of the State and corroborating his own. There *Page 492 
was a verdict of guilty of burglary in the first degree. Judgment of death, in accordance with law, was pronounced by the court below on the verdict. The defendant made numerous exceptions and assignments of error and appealed to the Supreme Court. The material ones and necessary facts will be considered in the opinion.
At the close of the State's evidence, and at the close of all the evidence, the defendant in the court below made motions to dismiss the action or for judgment of nonsuit. C. S., 4643. The court below overruled these motions, and in this we see no error.
These exceptions and assignments of error were not set forth in defendant appellant's brief. Rule of Practice in the Supreme Court, part of Rule 28 (200 N.C. 831) is as follows: "Exceptions in the record not set out in appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned by him." This is tantamount to the admission that the evidence was sufficient to be submitted to the jury. Nowell v. Basnight, 185 N.C. 142 (148); Jones v.Ins. Co., 210 N.C. 559.
The defendant sets forth the questions involved on the appeal:
(1) Did the court err in refusing defendant's motion to transfer this cause from the Superior Court of Mecklenburg County, North Carolina, to the United States District Court for the Western District of North Carolina, to be certified by said United States District Court as to the place of trial? We cannot so hold.
To sustain this motion defendant filed an affidavit and cited for his position Act of Congress, 3 March, 1863, Title 28, secs. 74 and 75, Judicial Code 31 and 32. On the petition the court below ruled: "Petition and motion is denied for the reason that the petition does not allege any denial of any rights by reason of any state law, statute, ordinance, regulation, or custom hostile to the rights of the petitioner."
In Fitzgerald v. Allman, 82 N.C. 492 (494), speaking to the subject, it is said: "In State v. Dunlap, 65 N.C. 491, decided at June Term, 1871, the statute is construed to extend to, and `include cases where, by reasonof prejudice in the community, a fair trial cannot be had in the State courts'; and this construction, followed in the court below, embraces that before us. Since this decision, the clause in the constitution which this act is intended to enforce has been interpreted and explained by the Supreme Court of the United States, more in consonance with its language and purposes, and it has been confined to trials in states whose *Page 493 
laws discriminate adversely against a class of citizens to which the persons asking for the removal belong. . . . (p. 495). It is not pretended that the laws and judicial practices in this State recognize any distinctions among its citizens `on account of race, color, or previous condition,' or that every right and privilege possessed by the white is not equally shared by the colored man. For local prejudice, the basis of the proposed removal, the law provides for a transfer of the cause, whoever may be the parties, to a county where such prejudice does not exist and a fair trial may be had." Slaughter House cases, 16 Wall., 36; Gibson v. Miss.,162 U.S. 565; Kentucky v. Powers, 201 U.S. 1; Norris v. Alabama,294 U.S. 587.
The remedy for any wrong, as complained of by defendant, is in the State Court and ultimately in the Supreme Court of the United States by writ of error to protect any right secured or granted to the accused by the Constitution or laws of the United States which has been denied to him in the highest court of the State in which the decision in respect to that right can be had. Powers case, supra.
(2) Did the court err in refusing to quash the bill of indictment because the grand jury which found the bill of indictment was improperly and illegally drawn, organized, and constituted? We think not, as the grand jury was legally organized.
The court below found: "Motion to quash the bill of indictment is denied and the court finds as a fact there are approximately 10,000 names of the white race in the jury box and something over 600 names of the colored race in the jury box, and at this term of court there is one colored man on the grand jury that returned a true bill in this case, and that there has been no discrimination against the defendant."
The clerk of the board of county commissioners testified: "The scrolls containing the colored race, approximately 650 in number, are still in red ink and the scrolls containing the names of the white race are in black ink. That condition existed at the time it was done in red and black ink so as to distinguish them, so they would know whether to look for a white man or a colored man. There is no discrimination in the selection of names; when a child draws a name out we put the name on the jury list, have a colored man on the grand jury now. There is no discrimination in the selection of the grand jury or petit jury. When the names are called out I put them on the list to give the sheriff to be summoned for jury service. We have been using a four-year-old child and if the name comes out red or black it is put on the list. The purpose in two different colors of ink is to see who to look for. It makes it easier to look for them. . . . There are about 650 names of the colored race and approximately 10,000 whites. There is one colored man on the grand jury now who found this bill. Q. In drawing the *Page 494 
jurors at former terms was a colored man on the petit jury? Ans.: Yes, sir, ever since last year we have had colored men drawn and on the civil jury frequently. I do not know how many. Q. Regardless of how many were drawn there was not but one colored man drawn this last time? Ans.: Yes, there were two. That is all that came out of the box; it should average about two out of thirty if the average is kept up."
The exclusion of all persons of the negro race from a grand jury, which finds an indictment against a negro, where they are excluded solely because of their race or color, denies him the equal protection of the laws in violation of the Constitution of N.C. and of the United States. S. v.Peoples, 131 N.C. 784.
The jury list and method of drawing the jury is set forth in C. S., 2312, 2313, and 2314. The names on the list are put in a box with two divisions, marked "one" and "two," and two locks. One is kept by the sheriff and one by the chairman of the board of county commissioners. The manner of drawing the jury is by a child not more than ten years of age, who draws the names of the jury out of partition marked "one." (In the present case the child was four years of age.) The scrolls so drawn to make up the jury are put in the partition marked "two."
The findings of the trial court, after hearing evidence, that the jurors were drawn, sworn, and impaneled in accordance with these sections, and that there was no discrimination against persons of the negro race in making up the jury lists, are conclusive on appeal when supported by sufficient evidence, in the absence of gross abuse. S. v. Cooper,205 N.C. 657. His Honor found that there had been no discrimination against persons of the defendant's race in the selection of the grand jury. This finding, when supported by evidence, is conclusive on appeal in the absence of gross abuse. S. v. Daniels, 134 U.S. 641; Texas v.Thomas, 212 U.S. 278; S. v. Cooper, supra.
The reason for having a child not more than ten years of age to draw the jurors is to prevent fraud in the selection of the jury, so that the law can be administered impartially and without discrimination. The child draws from the jury box the names of all sorts and conditions of men, white and negro persons, Jew and Gentile, who are qualified to serve under the law. A more perfect system could hardly be devised to insure impartiality. It is the duty of those charged with this important arm of the government to see to it that these provisions of the statute are carried out as provided in C. S., 2312, supra, which is as follows: "The board of county commissioners for the several counties at their regular meeting on the first Monday in June, in the year nineteen hundred and five, and every two years thereafter, shall cause their clerks to lay before them the tax returns of the preceding year for their county, from which they shall proceed toselect the names of all such persons as have paid *Page 495 all the taxes assessed against them for the preceding year and are of goodmoral character and of sufficient intelligence. (Italics ours.) A list of the names thus selected shall be made out by the clerk of the board of commissioners and shall constitute the jury list, and shall be preserved as such."
The child drawing the jury list, by custom, is often blindfolded to insure impartiality. If as many negroes are not drawn as defendant desired, he cannot complain — the chance in selecting same are applicable to both the white and negro race alike. The selection is fair and impartial.
(3) Did the court err in failing to charge the jury as to second degree burglary? We think not. All the evidence on the part of the State showed it was burglary in the first degree, if the State's evidence was to be believed by the jury. There can be no question that there was sufficient evidence to be submitted to the jury. S. v. Smith, 201 N.C. 494 (496) is contrary to the position taken by defendant. It is there said: "This Court has repeatedly disapproved the theory that the degree of guilt may arbitrarily be determined in the discretion of the jury without regard to the facts in evidence. The jury, having `no discretion against the obligation of their oath,' should never award a verdict independent of all proof. S. v. Fleming, 107 N.C. 905. The primary object of a verdict is to inform the court as to how far the facts established by the evidence conform to those which are alleged or charged and put in issue. If neither the specific act charged nor a lesser degree thereof nor an attempt to commit either of them is supported by proof, neither the principal nor the subordinate act can properly be made the basis of an affirmative verdict. In S. v. Johnston, 119 N.C. 883, the prisoner requested an instruction `that when the crime charged in the bill of indictment is burglary in the first degree the jury may render a verdict in the second degree if they deem it proper to do so.' The prayer was denied and on appeal the Court said: `Shields, a witness for the State, testified that at the time of the burglary he and his wife and daughter were occupying rooms in the house; that he was sleeping in a room on the first floor and his wife and daughter were sleeping in a room upstairs. Upon this testimony, if the jury believed it, the defendant was guilty of burglary in the first degree. There was no proof tending to show that the burglary might have been committed under circumstances which would make it burglary in the second degree under the statute. If his Honor had charged as he was requested it would have been error.' So, likewise, in S. v. Allen, 186 N.C. 302. A verdict for a lesser degree of the crime charged is logically permissible only when `there is evidence tending to support a milder verdict,' although there are decisions to the effect that if without such supporting evidence a verdict is returned for *Page 496 
the lesser offense it will not be disturbed because it is favorable to the prisoner. S. v. Ratcliff, 199 N.C. 9; S. v. Allen, supra."
(4) Did the court err in failing and refusing to charge the jury that if they were not satisfied beyond a reasonable doubt as to the guilt of the defendant on each and every count or any of said counts it would be their duty to acquit the defendant and return a verdict of not guilty of anything? As we construe the charge as a whole, we think there is no merit in this contention.
Before the commencement of the arguments, upon inquiry by Mr. Tarlton and in the presence of the jury, the court announced it would charge the jury that it may return one of the five following verdicts: Guilty of burglary in the first degree; Guilty of attempt to commit burglary in the first degree; Guilty of breaking and entering a dwelling house other than burglariously; Guilty of an attempt to break with intent to commit a felony; Not guilty. (S. v. Allen, 186 N.C. 302.) "If the State has satisfied you beyond a reasonable doubt as to the burglary in the first degree then you would not consider the other counts, but if the State has failed to satisfy you beyond a reasonable doubt and your verdict is not guilty of first degree burglary then you will proceed to the second count, that is an attempt to commit the crime of burglary in the first degree. An attempt to commit burglary in the first degree is composed of two elements," etc. The court then charged the other elements of the crime, with clearness and accuracy, on which defendant could be convicted or acquitted. "Find out what the truth is and speak that in your verdict. Your verdict can be one of five: Guilty of burglary in the first degree; guilty of an attempt to commit burglary in the first degree; if not guilty of that then guilty of breaking or entering other than burglary, with intent to commit a felony or the crime of larceny. If not guilty of them, an attempt to break or enter the home or dwelling of another with the intent to commit a felony therein; or not guilty."
(5) Did the court err in refusing to tell the jury of the punishment attempt to commit second degree burglary would carry? We think not.
In S. v. Matthews, 191 N.C. 378 (381), this Court has decided contrary to defendant's contentions: "The jury has fully discharged its duty, and performed its functions, under the law of this State, when its members have sat together, heard the evidence, and rendered their verdict accordingly. As the judge must not invade the true office and province of the jury by giving an opinion in his charge, either in a civil or criminal action, as to whether a fact is fully or sufficiently proven (C. S., 564), so the jury must be content to leave with the judge the grave responsibility imposed upon him to render a judgment, upon their verdict, according to law." *Page 497 
(6) Did the court err when the jury returned a verdict of guilty by saying: "You say that Tommie Walls is guilty of burglary in the first degree of the felony whereof he stands charged?" Was that not an expression of opinion? We think not; it was an inquiry.
The jury announced it was ready to render verdict and the clerk said, "Gentlemen of the Jury, answer to your names," and called each name separately and each juror answered "Present." (By the clerk) Q. "Have you agreed on your verdict?" A. "We have." (By the clerk) "Stand up Tommie Walls; hold up your right hand. Gentlemen of the Jury, look upon the prisoner; what say you as to his guilt of the felony burglary in which he stands indicted in the bill of indictment, Guilty or Not guilty?" A. "Guilty." (By the court) Q. "So say you all?" A. "Yes." (By the court) "By your verdict you say that Tommie Walls is guilty of burglary in the first degree of the felony whereof he stands charged?" A. "Yes, sir." (By the clerk of court) Q. "So say you all?" A. "Yes, sir, we find him guilty of first degree burglary with recommendation of the mercy of the court."
"Counsel for the defendant requested that the jury be polled, whereupon the clerk, under the directions of the court, called each juror by name, requesting that the said juror stand; that the clerk asked each juror two questions: (1) `Mr. Juror, did you assent to the verdict rendered by your foreman?' and (2) `Do you still assent thereto?' Each juror answered in the affirmative to each of the two questions propounded, each question being asked and answered separately." If there was error in the inquiry of the court, it was not prejudicial, as defendant had the jury polled.
The court below in the charge summarized the evidence, set forth the contentions on both sides fairly and impartially, charged that the burden was on the State to satisfy the jury beyond a reasonable doubt as to each aspect on which the defendant could be convicted or acquitted under the bill of indictment or found not guilty, and defined reasonable doubt. The charge was a long one, carefully prepared and gave the law applicable to the facts. In fact, it was so accurate and fair that defendant made no exceptions or assignments of error except those heretofore considered.
The evidence of Peter S. Gilchrist, Jr., was corroborated by other witnesses. He made a brave endeavor to stop the burglar, who attempted to and almost succeeded in killing him. "He left the house by means of an opened back window. I followed him through the back door and out through the back gate, down the alley to the next corner; we live two doors from the corner and I saw him under the street light again but was unable to get him because of loss of blood. . . . I *Page 498 
identified him from his face and also from the fact that he had blood on his right hand and his trousers were spattered with blood. . . . I found the knife you hand me in the possession of the man I caught in the house that morning. I did not pick it up in the room but obtained it from the man himself, in the dark; I did not see the knife until I returned to the house. There was blood on the knife. . . . I was in the hospital about two or three days and then in bed at home for another week."
The defendant, from his own evidence, showed himself to be a lawless, desperate man. The night of the burglary he was drinking at a beer garden and drank liquor — a half pint and a pint — "sat down on the steps of a church on Railroad Street, . . . came to myself there around 4 o'clock and they arrested me." Defendant admitted that he had theretofore been convicted (1) of housebreaking; (2) storebreaking; (3) murder, etc. He was tried for burglary in the first degree in 1926 and sent to the training school, as he was under 16 years of age. In 1931 he was tried for storebreaking and larceny and imprisoned 12 months. In 1932 he was tried for the murder of Howard Moore and imprisoned for 4 to 7 years.
The fight between Peter S. Gilchrist, Jr., and defendant (by his own admissions an ex-convict and desperado) was a desperate and dangerous one, after midnight, in the Gilchrist home. Few men under such trying circumstances have shown more courage and bravery than the younger Gilchrist did in the encounter with this desperate and dangerous man. The testimony of both Peter S. Gilchrist, Jr., and his father, Peter S. Gilchrist, Sr., was corroborated by facts that were pregnant as to identity — fresh blood on defendant's pants and right hand.
The defense is founded mostly on technicalities and refinements. A bill of indictment is never quashed "by reason of any informality or refinement." C. S., 4623. "The appellant is required to show error, and he must make it appear plainly, as the presumption is against him." In reRoss, 182 N.C. 477 (478). The whole purpose of the law is to administer justice and that law and order and orderly government may at all times be maintained. In the present case the defendant has been given every right and privilege known to the law. He has had a fair trial and been defended by an able counsel.
On the whole record, we find no reversible or prejudicial error.
No error. *Page 499