### LAFAYETTE MILLER v. STATE OF NORTH CAROLINA.

(Filed 30 January, 1953.)

**1. Criminal Law § 64 ½ b—**

In a proceeding under the Post-Conviction Hearing Act upon proper petition, the court correctly hears evidence, finds the facts, makes his conclusions of law, and enters judgment in accord therewith. G.S. 15-221.

**2. Criminal Law §§ 64 ½ d, 81h—**

In a proceeding under the Post-Conviction Hearing Act, the findings of fact by the court are binding upon review if they are supported by evidence.

**3. Same—**

An exception in general terms "to each of the findings of fact . . .," with assignment of error that the court committed prejudicial error in finding the facts as he did, *is held* insufficient to present for review the sufficiency of the evidence to support the findings. However, in this case the findings are reviewed as though appropriate exceptions and assignments of error had been entered, since the life of petitioner is at stake.

**4. Constitutional Law § 33: Jury § 1: Grand Jury § 1—**

The evidence in this case *held* to support the court's findings that petitioner, acting through his attorneys, waived his right to challenge the competency of the petit jurors by purposely refraining from asserting such right in the original criminal action, and also that no Negroes were intentionally excluded from the grand and petit juries on account of their race or color.

**5. Same—**

Where there is nothing of record to indicate the race of persons whose names appeared on the jury list, testimony of witnesses identifying a few

of them as Negroes has no probative force as to the number or proportion of Negroes thereon when it appears that the witnesses had no knowledge as to the race of the remainder.

**6. Same—**

A Negro citizen charged with crime has the constitutional right that members of his race be not intentionally excluded either from the grand or petit juries solely because of their race or color. Fourteenth Amendment to the Federal Constitution; Article I, Section 17, of the State Constitution.

**7. Same—**

A Negro accused of crime has no right to demand that the grand or petit jury shall be composed in whole or in part of citizens of his own race nor has he the right to proportional representation of his race thereon, but only that Negroes not be intentionally excluded therefrom because of their race or color.

**8. Same—**

The requirements that persons whose names are placed on the jury list be adult residents of the State, be of good moral character and have sufficient intelligence to serve as members of the grand and petit juries, are relevant qualifications which do not offend either the State or Federal Constitutions, there being no discrimination against any class of citizens solely because of race. G.S. 9-1.

**9. Same—**

A Negro objecting to a grand or petit jury because of alleged discrimination against Negroes in its selection must affirmatively prove that qualified Negroes were intentionally excluded from the jury because of their race or color.

**10. Same—**

A Negro accused of crime is entitled to a fair opportunity to have the question of whether members of his race have been intentionally excluded from the grand or petit juries because of race determined by adequate and timely procedure.

**11. Constitutional Law § 40—**

The accused in a criminal action may waive a constitutional right relating to a matter of mere practice or procedure, including the constitutional right of a Negro that members of his race be not intentionally excluded from the grand or petit juries. A waiver of such right by defendant's attorneys is binding on him.

**12. Same: Indictment § 12—**

A motion to quash the indictment is the proper procedure to raise the contention that members of defendant's race were discriminated against in the selection of the grand jury, and such motion may be made as a matter of right only up to the time of arraignment and plea, with discretionary power of the presiding judge to permit the motion thereafter as a matter of grace until the petit jury is sworn and impaneled, with no authority to hear the motion thereafter, and failure to follow this procedure waives the right to object on such grounds.

**13. Constitutional Law § 33: Jury § 4½ —**

Objection of a Negro defendant that members of his race were intentionally excluded from the petit jury because of their race or color must be raised by challenge to the array or motion to quash the panel or venire before entering upon the trial, and the considered conclusion of his duly appointed attorneys not to raise the question and the entering of a plea of not guilty without following such procedure, *is held* a waiver for all time of defendant's right to raise the objection.

**14. Criminal Law § 64½ a—**

The Post-Conviction Hearing Act is a procedure to grant a defendant appropriate post-trial remedy for substantial deprivations of his constitutional rights in the trial at which he was convicted when there has been no prior adjudication of such constitutional rights by any court of competent jurisdiction because he was prevented from claiming such rights by factors beyond his control, G.S. 15-217, G.S. 15-221, but the Act is not designed to add to the law's delays by giving the accused the right after conviction to raise constitutional questions which he could and should have raised in the original trial by appropriate procedure.

**15. Same—**

Where defendant's counsel appointed by the court concludes after due consideration that it is to their client's best interest not to raise by appropriate procedure the questions of whether members of defendant's race were excluded from the grand and petit juries, and therefore waive the right to raise the question, *held* such defendant has not been denied his constitutional right to raise the question and he is not entitled to present the question in a proceeding under the Post-Conviction Hearing Act, since a litigant does not suffer a denial of a constitutional right when he intentionally and voluntarily relinquishes it.

PARKER, J., took no part in the consideration or decision of this case.

PROCEEDING under the North Carolina Post-Conviction Hearing Act heard by *Clawson L. Williams, J.,* at the May Term, 1952, of the Superior Court of BEAUFORT County, and reviewed by the North Carolina Supreme Court upon a duly granted writ of *certiorari.*

The North Carolina Post-Conviction Hearing Act originated in Chapter 1083 of the 1951 Session Laws. It has since been codified as Article 22 of Chapter 15 of the General Statutes. See: 1951 Cumulative Supplement.

The petitioner, Lafayette Miller, a Negro, was indicted by a grand jury at the 14 January, 1952, Term of the Superior Court of Beaufort County for the murder of Harvey C. Boyd, a white man. He was tried by a petit jury on this charge at the same term. The petit jury found the petitioner guilty of murder in the first degree, but did not recommend that his punishment should be imprisonment for life in the State's prison. In consequence, Judge Williams, who presided at the trial, pronounced judgment of death against the petitioner in conformity with G.S. 14-17.

The appeal of the petitioner was dismissed and the judgment of death imposed on him was affirmed by the North Carolina Supreme Court on 9 April, 1952, upon grounds set out in the opinion reported in *S. v. Miller*, 235 N.C. 394, 70 S.E. 2d 2. As the result of this action, Friday, 25 April, 1952, was automatically fixed by G.S. 15-194 as the time for carrying out the judgment of death.

One day before that date, *i.e.*, on 24 April, 1952, the petitioner, who is imprisoned in the Central Prison, commenced this proceeding against the State of North Carolina under the provisions of the North Carolina Post-Conviction Hearing Act and obtained a judicial order in it staying the execution of the judgment of death until the proceeding could be judicially determined. The petition filed by the petitioner in this proceeding invokes in general terms the provisions of the Post-Conviction Hearing Act embodied in G.S. 15-217, which specify that "any person imprisoned . . . in Central Prison . . . who asserts that in the proceedings which resulted in his conviction there was a substantial denial of his rights under the Constitution of the United States or of the State of North Carolina, or both, as to which there has been no prior adjudication by any court of competent jurisdiction, may institute a proceeding under this article." The petition asserts that the petitioner's constitutional rights were violated in the original criminal action in these specific respects: "That he was indicted and tried by a grand jury and a petit jury in and for Beaufort County from which juries members of petitioner's race, to wit, Negroes, have been arbitrarily, systematically and discriminatorily excluded over the years, wholly and solely on account of their race and/or color." Within the thirty days specified by G.S. 15-220, *i.e.*, on 2 May, 1952, the State of North Carolina, acting through the solicitor of the judicial district embracing Beaufort County, answered the petition. The answer denies all the crucial averments of the petition; alleges in detail that there was no discrimination against Negroes in the selecting, drawing, and summoning of the grand and petit jurors who indicted and convicted the petitioner; and pleads in detail that the petitioner, acting through competent counsel, waived any right to charge any such discrimination by his conduct at the trial of the original criminal action.

The proceeding was tried at the May Term, 1952, of the Superior Court of Beaufort County by Judge Williams, who heard the evidence offered by the parties and passed upon the issues of fact arising in the proceeding without the aid of a jury in accordance with the provisions of the Post-Conviction Hearing Act codified as G.S. 15-221. The evidence is incorporated in the transcript of the record in this proceeding.

The essential facts are either judicially known or may be gleaned from the record proper in *S. v. Miller, supra;* the application of the petitioner

for the writ of *certiorari* for the review of this proceeding; the answer of the State to that application; and the transcript of the record in this proceeding. These facts and the inferences supported by them are stated in chronological order in the numbered paragraphs which immediately follow.

1. Beaufort County is an agricultural, lumbering, and maritime county, having a landed area of 531,840 acres. The census of 1940 divides its total population of 36,431 into these two racial groups: 22,632 whites, and 13,799 Negroes.

2. Negroes served on occasion upon juries in Beaufort County prior to 1935.

3. Ever since the "Scottsboro Cases" were decided by the United States Supreme Court in 1935, the county attorneys of Beaufort County have been careful to advise the Board of Commissioners of Beaufort County that discrimination in the selection of jurors on the grounds of race or color is forbidden by law; that it is the legal duty of the Board to select for jury service without regard to their race or color persons qualified by the law of North Carolina to act as grand and petit jurors in Beaufort County; and that citizens of North Carolina over the age of twenty-one years residing in Beaufort County are qualified by the law of North Carolina for jury service in Beaufort County if they "are of good moral character and have sufficient intelligence to serve as members of grand and petit juries." (See: G.S. 9-1; *Hinton v. Hinton,* 196 N.C. 341, 145 S.E. 615.)

4. Ever since 1935, the Board of Commissioners of Beaufort County has earnestly endeavored to select for jury service in the county without regard to their race or color persons possessing the qualifications prescribed by the State law for grand and petit jurors. As a consequence, "there have . . . been . . . very few terms of court" in Beaufort County since 1935 "when there have not been colored people on the grand jury, or the petit jury, or both." In 1937, the North Carolina Supreme Court upheld the decision of the Superior Court of Beaufort County in *S. v. Bell,* 212 N.C. 20, 192 S.E. 852, adjudging that "no discrimination was made between persons belonging to the white or negro race" in the selection of the jury panel involved in that case. There has been an "observable increase" in the number of Negroes called for jury service in Beaufort County since *S. v. Bell, supra,* was decided.

5. The jury list and jury box of Beaufort County have been completely revised during each odd numbered year as required by the statute incorporated in G.S. 9-1. The Beaufort County jury panel and the Beaufort County special venire under scrutiny in this proceeding were drawn from the jury box for the biennium beginning in July, 1951.

6. The jury box of Beaufort County for the biennium beginning in July, 1951, was the result of the official acts described in this paragraph. The Clerk of the Board of Commissioners of Beaufort County laid before the Board at its regular meeting on the first Monday in June, 1951, data from the tax returns of Beaufort County for the preceding year, showing the names of the 10,400 white and the 4,536 Negro taxpayers of Beaufort County. In so doing, the Clerk acted in substantial compliance with the mandatory provisions of G.S. 9-1. (See: *S. v. Brown,* 233 N.C. 202, 63 S.E. 2d 99.) The action of the Clerk was well calculated to place before the Board the names of virtually all persons possessing any qualifications for jury service in Beaufort County because the tax returns were required by law to disclose the names of all male residents over twenty-one and under fifty years of age, the names of all residents owning dogs, the names of all residents owning other tangible personal property having a value exceeding three hundred dollars, and the names of all persons owning real property in the county. The Board of Commissioners of Beaufort County selected from the data laid before it by its Clerk the names of those citizens of the State over twenty-one years of age residing in Beaufort County whom it decided to be of good moral character and sufficient intelligence to serve as members of grand and petit juries, and the Clerk of the Board took the names thus selected by the Board and made out a new jury list for the county consisting of those names only. In so doing, the Board and its Clerk acted in strict accord with the procedure established by G.S. 9-1. Subsequent to these events, to wit, at its regular meeting on the first Monday in July, 1951, the Board of Commissioners of Beaufort County caused the names on the new jury list to be copied on small scrolls of paper of equal size, and put into the division of the county jury box marked No. 1 after such jury box had been emptied of its previous contents. In so doing, the Board acted in complete compliance with G.S. 9-2. Neither the jury list nor the scrolls indicated in any way the race or color of the persons whose names they bore. The county jury box contained two divisions marked No. 1 and No. 2, respectively, and was equipped with two separate locks as required by G.S. 9-2. After the scrolls containing the names of those selected for jury service during the biennium beginning in July, 1951, had been placed in it, the jury box was locked. Subsequent to that event the key to one of the locks was kept by the Sheriff of Beaufort County, the key to the other lock was kept by the Chairman of the Board of Commissioners of Beaufort County, and the jury box was kept in the custody of the Clerk of the Board, all in obedience to G.S. 9-2.

7. The Board of Commissioners of Beaufort County consisted of Carl Alligood, Irvin Hodges, A. D. Swindell, Mark Taylor, and Max F. Thompson at the times specified in the preceding paragraph. Irvin

Hodges was Chairman of the Board. These Commissioners were elected to their offices by popular vote. One of them resided in each of the five geographical subdivisions of the county. Their administration of county government gave them many and varied contacts with substantial portions of both of the racial groups represented in the population of Beaufort County. As a result of these circumstances, the Commissioners possessed in the aggregate a dependable and extensive personal knowledge of the qualifications of both white and Negro residents of Beaufort County for service as members of grand and petit juries. Moreover, they made fair and honest efforts to determine by appropriate inquiries of well informed persons the qualifications for jury service of all resident taxpayers of the county not personally known to them whose names appeared in the data laid before them by their Clerk, irrespective of the race or color of such taxpayers. When it made its selection of persons to perform jury service in the county during the biennium beginning in July, 1951, the Board of Commissioners of Beaufort County selected without any regard whatever for their race or color citizens of the State over twenty-one years of age residing in Beaufort County whom it knew or found by fair inquiry to be possessed of good moral character and sufficient intelligence to serve as members of grand and petit juries. The Board did not intentionally exclude any Negroes from jury service because of their race or color. The attitude of each Commissioner, and the final result of the corporate labors of all of them are accurately epitomized in certain testimony given by Chairman Irvin Hodges, a witness for the petitioner, on the hearing of this proceeding in the Superior Court. When this testimony is rearranged in proper order for the sake of clarity, it comes to this: "I made . . . inquiry regarding those persons . . . I did not know, both white and colored, as to their qualifications. . . . I made no effort to discriminate because of race or color. I made inquiry only on qualifications of jurors. . . . There was no rejection of names, white or colored, for any reason . . . other than. . . . (lack of) qualifications . . . Some whites did not go in the box, and some coloreds did not go in . . . I determined the eligibility of Negroes . . . the same way I did for the whites. . . . I have no idea as to how many Negro names are in the jury box, but I know there are right many . . . If we think that a Negro is just as capable to perform jury service as a white person, his name goes into the box. There are not as many Negroes in the box as white. I think that the number of Negro names to white names in the box is pretty close to a pro rata part. By pro rata part, I mean according to the total number of taxpayers, white and colored." It appeared at the trial that it was impossible to determine by an examination of the court records, the jury list, or the jury box of Beaufort County how many white persons and how many Negroes were selected

for jury service during the biennium beginning in July, 1951, for the very simple reason that the court records, the jury list, and the scrolls in the jury box did not indicate the race or color of those selected.

8. The petitioner, a Negro man aged about twenty years, was arrested on the night of 21 November, 1951. He was forthwith formally charged by warrant with an offense punishable by death, namely, the first degree murder of Harvey C. Boyd, a white man aged twenty-one years. His case was set for trial at the regular term of the Superior Court of Beaufort County scheduled to convene on Monday, 14 January, 1952.

9. Several weeks before that date Judge Chester Morris, the judge then holding the courts of the judicial district embracing Beaufort County, appointed Hallet S. Ward and James B. McMullan, highly reputable members of the Beaufort County bar, to defend the petitioner. Judge Morris took this action under G.S. 15-4.1 because of the petitioner's financial incapacity to retain counsel of his own choosing. Ward and McMullan are competent lawyers. Indeed, Ward is one of the outstanding trial lawyers of North Carolina. He was admitted to the North Carolina Bar in 1893 after graduating in law at the University of North Carolina, and from that time to the present day has actively practiced his profession in the courts of Beaufort and neighboring counties. He has resided and maintained his law office at the county seat of Beaufort County since 1905, and in consequence has had personal knowledge of the constitution of grand and petit juries in Beaufort County during all the times set out above. Notwithstanding his long career at the bar, Hallet Ward's eye is not dim, nor his natural force substantially abated. He is rightly noted for his sound judgment as a counsellor, his ability and zeal as an advocate, and his undiluted intellectual honesty. James B. McMullan is an alert and well trained young lawyer who has practiced at the Beaufort County bar about two and a half years.

10. Ward and McMullan consulted with the petitioner shortly after they were assigned to defend him, and then made the factual and legal investigations necessary to enable them to present at the trial any available matter in defense or mitigation of the charge against their client. In so doing, they ascertained that there were two versions of the homicide under investigation, one based on evidence at the disposal of the State, and the other resting upon the unsupported assertions of the petitioner.

11. The State's version was as follows: Neither Harvey C. Boyd nor his wife, Opal Boyd, had any personal acquaintance with the petitioner. On the night of 21 November, 1951, the petitioner armed himself with a shotgun, and went to the home of Harvey C. Boyd in a rural section of Beaufort County with intent to kill him. The petitioner concealed himself in the darkness outside the home until Harvey C. Boyd and his wife, Opal Boyd, entered their bedroom preparatory to retiring. The peti-

tioner then crept to a window of the bedroom, and shot and killed Harvey C. Boyd, who was ignorant of both the presence and purpose of his assailant. Immediately after the slaying, the petitioner imprisoned the deceased's wife, Opal Boyd, in the back compartment or trunk of the deceased's automobile, and drove such automobile away. As he was driving the deceased's automobile along a public highway at a considerable distance from the place of the homicide, the petitioner was stopped by two State highway patrolmen. The patrolmen heard the screams of a woman emanating from the rear compartment or trunk of the halted automobile. They opened the compartment or trunk, found Opal Boyd confined in it, released her, and arrested the petitioner, who afterwards voluntarily stated that he shot Harvey C. Boyd in order to obtain his automobile.

12. The petitioner's version was that he became personally acquainted with Mrs. Opal Boyd when he was employed to mow grass in the yard at the Boyd home; that Mrs. Boyd told him that she and her husband were "not getting along good," and that she wanted him to kill her husband; that he promised her that he would do so on a specified night; that he armed himself with a shotgun and went to the Boyd home on the appointed night for the purpose of killing Boyd; that on his arrival there, he went to an open window, and observed Boyd and his wife inside the house; that Mrs. Boyd saw him, came into the yard, and told him to shoot Boyd; that he advised Mrs. Boyd that he had never "done nothing like that" and suggested that she "do it"; that Mrs. Boyd replied that she could not "shoot a gun"; that he "fixed the gun," handed it to her, and told her to shoot Boyd; and that Mrs. Boyd took the gun and shot Boyd.

13. Ward and McMullan knew that under G.S. 14-17 "a murder . . . perpetrated by means of . . . lying in wait, . . . or by any other kind of willful, deliberate and premeditated killing, or . . . committed in the perpetration or attempt to perpetrate any . . . robbery" is murder in the first degree. As the result of their investigation, they came to these deliberate and honest conclusions: (1) That under either version of the homicide, the petitioner was guilty of murder in the first degree; (2) that it was virtually certain that the petitioner would be found guilty of murder in the first degree by any petit jury impaneled to pass upon the question of his guilt or innocence; and (3) that the petitioner could not possibly be saved from capital punishment for the homicide unless the trial jurors could be persuaded to exercise the discretionary power vested in them by G.S. 14-17 and recommend that his punishment should be imprisonment for life in the State's prison rather than death. Ward and McMullan based their subsequent defense of the petitioner upon these considered and sincere convictions.

14. Ward and McMullan pondered the question whether they ought to challenge the validity of any indictment returned against the petitioner by a Beaufort County grand jury on the theory that qualified Negroes had been intentionally excluded from the grand jury on account of their race or color. They reached the deliberate and honest determination that they would not be justified in interposing any such challenge for two reasons somewhat alternative in character. Their primary reason was that they firmly believed that qualified Negroes had not in fact been purposely excluded from the jury list and the jury box of Beaufort County on account of their race or color, and that in consequence the racial exclusion theory was devoid of merit. Their secondary reason was based on different considerations. They knew that the grand jury hears no evidence save that submitted to it by the prosecution; that the grand jury does not pass upon the guilt or innocence of the accused, but, on the contrary, merely decides whether or not the evidence of the prosecution, standing alone, reasonably justifies putting him on trial before a petit jury; and that the grand jury decides this question adversely to the accused whenever as many as twelve of its eighteen members so vote. They were satisfied, moreover, that a new grand jury, wholly unexceptionable in character, would be impaneled in Beaufort County at an early date if the court, perchance, should take what they deemed to be an inconceivable course and quash an indictment against the petitioner on the theory that racial exclusion had been purposely practiced in the selection of the grand jurors returning such indictment; that such new grand jury would indict the petitioner anew immediately after hearing the testimony of the prosecution, no matter what its racial composition might be; and that in consequence the quashing of an indictment against the petitioner on the racial exclusion theory would cause a mere temporary delay in his trial without effecting any real benefit to him.

15. At least twenty days before the regular term of the Superior Court of Beaufort County scheduled to begin on Monday, 14 January, 1952, the Board of Commissioners of Beaufort County caused a child not more than ten years of age to draw from the county jury box out of the division marked No. 1 fifty-seven scrolls to the end that a jury panel might be provided for such term in obedience to G.S. 9-3. It appears inferentially that three of the scrolls were destroyed under G.S. 9-7 because the persons whose names were inscribed on them had either died or removed from the county. The fifty-four persons whose names appeared on the remaining scrolls were summoned to appear at the term in question for service as grand and petit jurors.

16. The Superior Court of Beaufort County convened on Monday, 14 January, 1952, with Judge Williams presiding. Under his direction, the names of the fifty-four persons constituting the jury panel for the

term were written on scrolls, which were put into a hat. Eighteen of the scrolls were drawn out of the hat by a child under ten years of age. The eighteen persons whose names were inscribed on the scrolls thus drawn from the hat were sworn and impaneled as grand jurors, and served as such during the term as prescribed by G.S. 9-24. All of the eighteen grand jurors belonged to the white race. The remaining thirty-six persons on the panel had no connection whatever with the trial of the petitioner. The only evidence at the hearing of this proceeding relating to the race of these persons appears in this somewhat conjectural statement of the petitioner's witness Bryan Marslender: "I do not think there were any Negroes on the regular jury panel for that term of court from which the grand jury was drawn. I don't recall seeing any."

17. After hearing the State's evidence, the grand jury returned into open court as a true bill an indictment charging the petitioner with the first degree murder of Harvey C. Boyd. Counsel for the petitioner did not undertake to challenge the validity of the indictment by a motion to quash or otherwise on the theory that Negroes had been intentionally excluded from the grand jury on account of their race or color. Indeed, they deliberately refrained from doing so for the reasons detailed in paragraph 14 of this statement.

18. On his arraignment, the petitioner pleaded "not guilty," and moved the presiding judge that a special venire be summoned from Martin County, another county in the same judicial district, to serve as petit jurors in the criminal action against him. The judge allowed the motion under G.S. 1-86, and directed that the special venire should be drawn from the jury box of Martin County by a child under ten years of age in the presence of the petitioner and his counsel, counsel for the prosecution, and specified officers of Martin County. The special venire was drawn from the jury box of Martin County in strict obedience to the directions of the judge.

19. No qualified Negroes had been excluded from the jury box of Martin County on account of their race or color. Indeed, counsel for the petitioner stated on the hearing of this proceeding that they "do not attack the Martin County jury in this hearing."

20. The special venire from Martin County appeared in the Superior Court of Beaufort County at the appointed time. It consisted of eighty-three white persons and twenty-four Negroes. Counsel for the petitioner did not challenge the array or move to quash the venire from Martin County on the theory that Negroes had been intentionally excluded from the venire on account of their race or color. Indeed, they deliberately refrained from so doing because they firmly believed that no such racial exclusion had occurred and because they were convinced that they could

not reasonably expect to secure a jury panel more favorable to the petitioner than that drawn from the jury box of Martin County.

21. Eleven of the requisite twelve petit jurors were obtained from the special venire summoned from Martin County before it was exhausted. Eight of them were white persons, and three of them were Negroes.

22. The presiding judge ordered that an additional special venire of thirty persons be summoned from Beaufort County, where the trial was being held, to the end that the trial jury might be completed. In pursuing this course, the judge acted "by consent" of counsel for the prosecution and the defense and under G.S. 1-86. Pursuant to this same statute and G.S. 9-30, the presiding judge required the Clerk of the Board of Commissioners of Beaufort County to bring the county jury box into open court, and caused thirty scrolls to be drawn from the jury box out of the division marked No. 1 by a child under ten years of age in the presence of the petitioner and his counsel. The thirty persons drawn from the jury box in this manner were summoned as the additional special venire from Beaufort County. The transcript of the record makes it plain that two of these special veniremen, to wit, the ones selected as the twelfth and the alternative jurors, were white persons and that one of them, namely Estalla Bland, was a Negro. It does not disclose the race of the other twenty-seven unless that disclosure is made by these somewhat uncertain words of the petitioner's witness Bryan Marslender: "In my minutes I have the names of 30 persons drawn in the special venire from Beaufort County. One of the jurors drawn from that panel served on the trial jury which tried the petitioner Lafayette Miller, but I do not remember the names. On the panel of 30 drawn for that special venire was the name of Estalla Bland. I have checked the records and find that Estalla Bland is a colored person, living at Pantego."

23. The attorneys for the petitioner did not challenge the array or move to quash the additional special venire from Beaufort County on the theory that Negroes had been intentionally excluded from such venire on account of their race or color. Indeed, they deliberately refrained from so doing because they firmly believed that no such racial exclusion had occurred.

24. The twelfth petit juror and an alternate juror were obtained from the additional special venire from Beaufort County. Both of them were members of the white race. Since the alternate juror did not participate in the decision of the case, the petit jurors who actually tried the original criminal action consisted of nine white persons and three Negroes.

25. When the original criminal action was tried on its merits at the January Term, 1952, of the Superior Court of Beaufort County, the State offered testimony sufficient to show that the petitioner killed Harvey

C. Boyd under the circumstances delineated in paragraph 11 of this statement. The petitioner, who insisted on taking the witness stand despite the advice of his attorneys to the contrary, gave the version of the slaying depicted in paragraph 12 of this statement.

26. The petit jury found the petitioner guilty of murder in the first degree, but did not recommend that his punishment should be imprisonment for life in the State's prison. Judge Williams pronounced judgment of death against him. The petitioner's attorneys excepted to the judgment, and gave notice of appeal from it to the North Carolina Supreme Court. They did not perfect the appeal by serving a statement of case on appeal upon the solicitor for reasons stated in the next paragraph.

27. The attorneys for the petitioner were convinced that the trial which resulted in the conviction and sentence of their client was wholly free of legal error, and that in consequence it would be utterly useless to perfect the appeal to the North Carolina Supreme Court. This consideration induced them to seek executive clemency. Hallet S. Ward made this illuminating statement on the hearing of the proceeding: "I don't know whether I did the right thing or not, but I did an honest thing. I had no exception on that record that I was willing to stand in the Supreme Court, and insist upon, and I have got enough self-respect . . . to want to be able to give a sensible and respectful reason for any position that I take before any court, and I determined, and Mr. McMullan agreed with me, for we conferred upon it several times, that our service to this prisoner consisted of appeal to the Governor to commute the sentence."

28. For the reasons stated above, Ward and McMullan made application to the Governor of North Carolina for commutation of the petitioner's sentence to life imprisonment, and were informed by the Governor that the executive department would not consider the application while an appeal by the petitioner was still pending in the courts. In order to remove this bar to the consideration of the application for executive clemency, Ward and McMullan filed a motion dated 29 February, 1952, in the North Carolina Supreme Court, asserting that they were "unable to assign error to any part of the record or evidence in the cause," and praying for permission "to withdraw the appeal in the cause" on that ground.

29. While this motion was awaiting a hearing, the Attorney-General of North Carolina moved to docket and dismiss the appeal under Rule 17 of the Rules of Practice of the North Carolina Supreme Court, and for an affirmance of the judgment of death. On 9 April, 1952, the North Carolina Supreme Court allowed the motion of the Attorney-General after its own examination of the record proper in the original criminal action revealed that no error appeared on the face of the record. See: *S. v. Miller, supra.*

30. Subsequent to that event, the Governor of North Carolina informed Ward and McMullan that he had investigated the case; that he had had the petitioner examined by a psychiatrist; and that he had found nothing that would justify him in extending executive clemency to the petitioner.

31. After the application for executive clemency had been denied by the Governor, to wit, on 24 April, 1952, Herman L. Taylor, a member of the Wake County bar, and W. Frank Brower, a member of the Durham County bar, brought this proceeding in behalf of the petitioner against the State of North Carolina, and in that way made their initial appearances in the courts as counsel for the petitioner. In instituting and prosecuting this proceeding, Taylor and Brower act without the concurrence of the petitioner's original attorneys, Ward and McMullan.

32. When this proceeding was heard by Judge Williams at the May Term, 1952, the petitioner called these persons to the witness stand: Bryan Marslender, Clerk of the Superior Court of Beaufort County; W. B. Carter, Chairman of the Board of Elections of Beaufort County; D. E. Redditt, the Tax Collector of Beaufort County; William Rumley, the Sheriff of Beaufort County; Jack Harris, a Deputy Sheriff of Beaufort County; C. C. Duke, the Clerk of the Board of Commissioners of Beaufort County; Irvin Hodges, Carl Alligood, A. D. Swindell, and Mark Taylor, the four surviving members of the Board of Commissioners of Beaufort County; and John I. Morgan, a white citizen of Beaufort County. The State's witnesses at such hearing were Lonnie Dennis, a Negro citizen of Beaufort County; Hallet S. Ward, James B. McMullan, J. D. Grimes, and M. C. Paul, members of the Beaufort County bar; Elbert Peel, the County Attorney of Martin County; L. B. Wynn, the Clerk of the Superior Court of Martin County; and J. S. Getsinger, the Clerk of the Board of Commissioners of Martin County. The petitioner noted four exceptions to the admission of testimony given by Hallet S. Ward. These exceptions have since been abandoned by the petitioner under the Rules of Practice of the North Carolina Supreme Court.

33. There was no discordancy whatever between the testimony of the petitioner's witnesses and that of the State's witnesses at the hearing in this proceeding. The harmonious evidence of the witnesses in this proceeding, the record proper in *S. v. Miller, supra,* the application of the petitioner for the writ of *certiorari* for the review of this proceeding, and the answer of the State to that application reveal the truth of all the matters and things set out in paragraphs 2 to 28, both inclusive, of this statement.

After hearing the evidence in this proceeding, Judge Williams made voluminous findings of fact, conforming, in essential respects, to the matters stated in paragraphs 1, 2, 3, 4, 5, 6, 7, 9, 10, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 26, 27, 28, 29, 30, and 31. He made these conclusions of

law in considerable detail thereon: (1) That the petitioner, acting through his original attorneys, waived his alleged constitutional right to challenge the competency of the grand jurors who indicted him by purposely refraining from asserting it in the original criminal action; (2) that the petitioner, acting through his original attorneys, waived his alleged constitutional right to challenge the competency of the petit jurors who convicted him by purposely refraining from asserting it in the original criminal action; and (3) that no Negroes were intentionally excluded from the grand and petit juries which indicted and convicted the petitioner on account of their race or color. Judge Williams entered judgment declaring that the petitioner is not entitled to any relief in this proceeding, and vacating the judicial order staying the execution of the judgment of death. He stipulated, however, that the vacation of the judicial order staying the execution of the judgment of death should not take effect until the North Carolina Supreme Court had been afforded an opportunity to review his judgment upon *certiorari* under G.S. 15-222.

The petitioner applied to us for a writ of *certiorari* to review the judgment in the proceeding within 60 days from its entry, and we granted his application. He asserts, in substance, that Judge Williams erred "in finding the facts as he did"; in making his conclusions of law thereon; and in entering his judgment.

*Taylor & Mitchell and W. Frank Brower for the petitioner.*

*Attorney-General McMullan and Assistant Attorney-General Moody for the State.*

ERVIN, J. This is the first proceeding under the North Carolina Post-Conviction Hearing Act to come before the North Carolina Supreme Court.

The trial of the proceeding in the Superior Court was accordant with the procedure established by the act. G.S. 15-221. After hearing the testimony, the presiding judge made findings of fact in commendable detail, declared his conclusions of law upon them, and entered final judgment adverse to the petitioner.

The findings of fact of the judge are binding upon the petitioner on this review if they are supported by evidence. *S. v. Brown, supra; S. v. Kirksey,* 227 N.C. 445, 42 S.E. 2d 613; *S. v. Henderson,* 216 N.C. 99, 3 S.E. 2d 357; *S. v. Bell, supra; S. v. Walls,* 211 N.C. 487, 191 S.E. 232; *S. v. Cooper,* 205 N.C. 657, 172 S.E. 199; *S. v. Daniels,* 134 N.C. 641, 46 S.E. 743.

The petitioner undertakes to challenge the sufficiency of the evidence to support the findings of fact of the judge by excepting in general terms "to each of the findings of fact . . . set out by the court," and by assert-

ing without specification in his first assignment of error that "the court committed prejudicial error in finding the facts as he did." This exception and this assignment of error fall short of the requirement that "when it is claimed that the findings of fact made by the trial judge are not supported by the evidence, the exceptions and the assignments of error in relation thereto must specifically and distinctly point out the alleged errors." *Burnsville v. Boone,* 231 N.C. 577, 58 S.E. 2d 351. Since the petitioner's life hangs in the balance, we have nevertheless examined and weighed the evidence in this proceeding with the same meticulous and painstaking care we would have employed had he noted appropriate exceptions and assignments of error to all of the findings of fact adverse to him.

The evidence supports the findings of fact. Yea, it necessitates them. It appears, in substance, in paragraphs 1, 2, 3, 4, 5, 6, 7, 9, 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 26, 27, 28, 30, and 31 of the statement of facts, which contains a complete history of the original criminal action resulting in the petitioner's conviction and this proceeding as such history is revealed by the record proper in *S. v. Miller, supra,* the application of the petitioner for the writ of *certiorari* for the review of this proceeding, the answer of the State to that application, and the transcript of the record in this proceeding.

We digress at this point to make some incidental observations. In reaching the conclusion that the evidence compels the findings of fact made by the presiding judge, we have not disregarded the arithmetical arguments advanced by the petitioner on the basis of the testimony of his witnesses D. E. Redditt, the Tax Collector of Beaufort County, and Bryan Marslender, the Clerk of the Superior Court of Beaufort County. The petitioner's assertion that "only 15 Negroes . . . sat as grand jurors" in Beaufort County during the five years next preceding the trial of this proceeding rests solely upon a bit of evidence given by Redditt on his third and final appearance on the witness stand. On a proper analysis this testimony is destitute of probative value. Redditt had nothing to do with the selecting, drawing, or summoning of persons for jury service in Beaufort County. He had, moreover, no connection with the administration of justice in Beaufort County, or with the keeping of any records relating to that endeavor. He did not, in fact, possess any knowledge whatever of the racial composition of Beaufort County grand juries, and his own evidence on his prior appearances on the witness stand positively negatives any implication that he did. Redditt merely testified on his last visit to the stand that he had made an examination in some unexplained way of 23 unauthenticated writings purporting to be grand jury lists of Beaufort County covering in part the five years next preceding the trial of this proceeding, and that he had "identified 15" of the 414

persons whose names appeared in such writings "to be Negroes." Manifestly this testimony leaves to speculation the racial identities of the other 399 persons listed.

The transcript of the record reveals that 64 weeks of court were held in Beaufort County in the five years preceding the hearing in this proceeding, and that 2,211 persons were drawn for jury service during 43 of these weeks. It does not expressly appear how many persons were drawn for such service during the other 21 weeks because the number drawn for the first week of the May Term, 1949, was not proved at the trial, and the exhibit showing the numbers drawn for the remaining 20 weeks was omitted from the transcript of the record when its evidential contents were settled by stipulation between counsel for the petitioner and the solicitor of the judicial district embracing Beaufort County. Since it was customary to draw no fewer than 36 persons for service as petit jurors during each week of civil court and no fewer than 54 persons for service as grand and petit jurors during each week of criminal court as authorized by G.S. 9-3, it can be inferred with complete assurance that at least 900 persons were drawn for jury service in Beaufort County during the 13 weeks of civil court and the 8 weeks of criminal court included in the 21 weeks set forth above. This being true, at least 3,111 persons were drawn for service as grand and petit jurors in Beaufort County during the 64 weeks of court held in the five years next preceding the trial of this proceeding.

The petitioner undertook to have Marslender classify the 3,111 persons as to race by merely inspecting their bare names as they were recorded on minute dockets, which contained no indication of the race of any of them. Marslender stated that he did "not know too many colored people in Beaufort County personally," and that his mere perusal of the bare names on the minute dockets enabled him to identify only 28 of the 3,111 persons in question as Negroes. He testified further, however, that he did "not mean to testify" these 28 persons comprised "all the Negroes on these panels"; that he was able to classify only 815 of the 3,111 persons in question as members of the white race; and that he was totally unable to testify as to the racial identities of the remaining 2,268 persons whose names appeared on the minute dockets. These things being true, the intimation that only 28 Negroes were called for jury service in Beaufort County during the five years prior to the hearing in this proceeding finds no support in Marslender's evidence. Indeed, such intimation flies in the face of Marslender's positive statement: "I know there have been but a very few terms of court when there haven't been colored people on the grand jury, or the petit jury, or both." The 36 members of the regular panel and the 27 special veniremen mentioned in paragraphs 16 and 22 of the statement of facts are included in the 815 persons classified by

Marslender as members of the white race. We close these incidental observations by noting that Lonnie Dennis, the only Negro witness, testified he did not know any Negroes qualified to serve on a jury who had been excluded from so doing by officials of Beaufort County.

Apart from the North Carolina Post-Conviction Hearing Act, the law bearing on the questions arising on this review is well settled. It is set forth in the numbered paragraphs which follow:

1. A state denies to a Negro citizen charged with crime the equal protection of the laws contrary to the Fourteenth Amendment to the United States Constitution whenever its legislators, or its courts, or its administrative officers intentionally exclude Negro citizens from service upon the grand jury that indicts him or the petit jury which tries him solely because of their race or color. *Shepherd v. Florida,* 341 U.S. 50, 71 S. Ct. 549, 95 L. Ed. 740; *Moore v. New York,* 333 U.S. 565, 68 S. Ct. 705, 92 L. Ed. 881; *Brunson v. North Carolina,* 332 U.S. 851, 68 S. Ct. 634, 92 L. Ed. 1132; *Patton v. Mississippi,* 332 U.S. 463, 68 S. Ct. 184, 92 L. Ed. 76, 1 A.L.R. 2d 1286; *Hill v. Texas,* 316 U.S. 400, 62 S. Ct. 1159, 86 L. Ed. 1559; *Smith v. Texas,* 311 U.S. 128, 61 S. Ct., 164, 85 L. Ed. 84; *Pierre v. Louisiana,* 306 U.S. 354, 59 S. Ct. 536, 83 L. Ed. 757; *Hale v. Kentucky,* 303 U.S. 613, 58 S. Ct. 753, 82 L. Ed. 1050; *Hollins v. Oklahoma,* 295 U.S. 394, 55 S. Ct. 784, 79 L. Ed. 1500; *Norris v. Alabama,* 294 U.S. 587, 55 S. Ct. 579, 79 L. Ed. 1074; *Rogers v. Alabama,* 192 U.S. 226, 24 S. Ct. 257, 48 L. Ed. 417; *Neal v. Delaware,* 103 U.S. 370, 26 L. Ed. 567; *Ex Parte Virginia,* 100 U.S. 339, 25 L. Ed. 676; *Strauder v. West Virginia,* 100 U.S. 303, 25 L. Ed. 664; *S. v. Peoples,* 131 N.C. 784, 42 S.E. 814. A similar conclusion is reached in North Carolina under the law of the land clause embodied in Article I, Section 17, of the State Constitution. *S. v. Speller,* 229 N.C. 67, 47 S.E. 2d 537.

2. The Fourteenth Amendment to the Constitution of the United States does not confer upon a Negro citizen charged with crime in a state court the right to demand that the grand or petit jury, which considers his case, shall be composed, either in whole or in part, of citizens of his own race. All he can demand is that he be indicted or tried by a jury from which Negroes have not been intentionally excluded because of their race or color. In consequence, there is no constitutional warrant for the proposition that a jury which indicts or tries a Negro must be composed of persons of each race in proportion to their respective numbers as citizens of the political unit from which the jury is summoned. *Cassell v. Texas,* 339 U.S. 282, 70 S. Ct. 629, 94 L. Ed. 839; *Martin v. Texas,* 200 U.S. 316, 26 S. Ct. 338, 50 L. Ed. 497; *Carter v. Texas,* 177 U.S. 442, 20 S. Ct. 687, 44 L. Ed. 839; *Gibson v. Mississippi,* 162 U.S. 565, 16 S. Ct. 904, 40 L. Ed. 1075; *Shibuya Jugiro v. Brush,* 140 U.S. 291, 11 S. Ct. 770,

35 L. Ed. 510; *Bush v. Kentucky,* 107 U.S. 110, 1 S. Ct. 625, 27 L. Ed. 354; *Virginia v. Rives,* 100 U.S. 313, 25 L. Ed. 667; *S. v. Brown, supra; S. v. Speller,* 231 N.C. 549, 57 S.E. 2d 759, and 230 N.C. 345, 53 S.E. 2d 294; *S. v. Koritz,* 227 N.C. 552, 43 S.E. 2d 77; *S. v. Sloan,* 97 N.C. 499, 2 S.E. 666.

3. A state may prescribe such relevant qualifications as it deems proper for jurors without offending the Fourteenth Amendment to the United States Constitution as long as it takes care that no discrimination in respect to jury service is made against any class of citizens solely because of their race. Hence, a state statute may restrict eligibility for jury service in a county to adult citizens and residents who are of good moral character and have sufficient intelligence to serve as members of grand and petit juries, and confer upon county commissioners the discretionary power to select for jury service in the county without regard to their race or color those adult citizens and residents who in their judgment possess these qualifications. *Fay v. New York,* 332 U.S. 261, 67 S. Ct. 1613, 91 L. Ed. 2043; *Franklin v. South Carolina,* 218 U.S. 161, 30 S. Ct. 640, 54 L. Ed. 980; *Williams v. Mississippi,* 170 U.S. 213, 18 S. Ct. 583, 42 L. Ed. 1012; *Murray v. Louisiana,* 163 U.S. 101, 16 S. Ct. 990, 41 L. Ed. 87; *Gibson v. Mississippi, supra; Shibuya Jugiro v. Brush, supra; Wood v. Brush,* 140 U.S. 278, 11 S. Ct. 738, 35 L. Ed. 505. The North Carolina statute does not contravene the Fourteenth Amendment. It prescribes relevant qualifications for jurymen, and does not discriminate against any persons because of race or color. G.S. 9-1.

4. A Negro objecting to a grand or petit jury because of alleged discrimination against Negroes in its selection must affirmatively prove that qualified Negroes were intentionally excluded from the jury because of their race or color. *Fay v. New York, supra; Akins v. Texas,* 325 U.S. 398, 65 S. Ct. 1276, 89 L. Ed. 1692; *Martin v. Texas, supra; Brownfield v. South Carolina,* 189 U.S. 426, 23 S. Ct. 513, 47 L. Ed. 882; *Tarrance v. Florida,* 188 U.S. 519, 23 S. Ct. 402, 47 L. Ed. 572; *Williams v. Mississippi, supra; Smith v. Mississippi,* 162 U.S. 597, 16 S. Ct. 900, 40 L. Ed. 1082.

5. The Fourteenth Amendment to the United States Constitution requires a state to extend to a Negro charged with crime in its court a fair opportunity to have it determined by adequate and timely procedure whether Negroes legally qualified to serve as jurors have been intentionally excluded on account of their race or color from the grand jury returning an indictment against him or from the lists of those drawn or summoned to serve as petit jurors on his trial. *Rogers v. Alabama, supra; Carter v. Texas, supra.* North Carolina criminal procedure, which is set forth below in numbered paragraphs 7 and 8, grants to a Negro defendant a fair and full opportunity to assert and establish an objection of this

nature at the trial of the original criminal action against him, and thus satisfies this requirement of the Fourteenth Amendment. *Carter v. Texas, supra.*

6. The accused in a criminal action may waive a constitutional right relating to a mere matter of practice or procedure. *S. v. Hartsfield,* 188 N.C. 357, 124 S.E. 629; *Jennings v. Illinois,* 342 U.S. 104, 72 S. Ct. 123, 96 L. Ed. 119; *Yakus v. United States,* 321 U.S. 414, 64 S. Ct. 660, 88 L. Ed. 834; *Parker v. United States,* 184 F. 2d 488; *People v. Harris,* 302 Ill. 590, 135 N.E. 75; 16 C.J.S., Constitutional Law, section 91; 22 C.J.S., Criminal Law, section 91. Hence, the constitutional right of a Negro defendant to be indicted or tried by a jury from which members of his race have not been intentionally excluded may be waived by him. *S. v. Kirksey, supra; Washington v. State,* 95 Fla. 289, 116 So. 470; *Merriweather v. Commonwealth,* 118 Ky. 870, 82 S.W. 592, 4 Ann. Cas. 1039; *Haggard v. Commonwealth,* 79 Ky. 366; *Keith v. State,* 53 Ohio App. 58, 4 N.E. 2d 220; *Watts v. State,* 75 Tex. Crim. Rep. 330, 171 S.W. 202. It is inherent in the judicial process that courts must deal with litigants as though they were acting in the persons of their attorneys. For this reason, the law confers upon the attorney for the defense in a criminal case the power to take such steps in matters of practice and procedure as he deems appropriate to protect the interests of the accused, and decrees that the accused is bound by his action as to those matters. *Abney v. State,* 47 Ga. App. 40, 169 S.E. 539; *State v. Froah,* 220 Iowa 840, 263 N.W. 525; *State v. Dangelo,* 182 Iowa 1253, 166 N.W. 587; *Dewberry v. Commonwealth,* 241 Ky. 726, 44 S.W. 2d 1076; *Sayre v. Commonwealth,* 194 Ky. 338, 238 S.W. 737, 24 A.L.R. 1017; *Bonar v. Commonwealth,* 180 Ky. 338, 202 S.W. 676; *State v. Turlok,* 76 Mont. 549, 248 P. 169; *State v. Keller,* 57 N.D. 645, 223 N.W. 698, 64 A.L.R. 434; *Jacobs v. State,* 85 Tex. Crim. Rep. 505, 213 S.W. 628. It necessarily follows that the attorney for the defense in a criminal action may waive a constitutional right of his client relating to a matter of practice or procedure. *S. v. Hartsfield, supra; James v. Commonwealth,* 197 Ky. 338, 247 S.W. 945. The right of a Negro defendant to object to a grand or petit jury upon the ground of discrimination against members of his race in the selection of such jury is waived by failing to pursue the proper remedy. *S. v. Kirksey, supra.* See, also, in this connection the cases collected in the annotation in 52 A.L.R. 919. This statement of the Circuit Court of Appeals for the Eighth Circuit is pertinent: "Where parties, even in a criminal case, knowingly and deliberately adopt a course of procedure which at the time appears to be to their best interest, they cannot be permitted at a later time, after a decision has been rendered adverse to them, to obtain a retrial according to procedure which they have voluntarily discarded and waived. *Johnson v. Zerbst,* (304 U.S.

458), Syl. 2, page 458, 58 S. Ct. page 1019. Full opportunity having been afforded the appellants to apply to have the jury panel quashed and to have Negroes summoned on a new jury panel, they could not deliberately withhold their application for such procedure and then be heard after conviction to assert on *habeas corpus* that their conviction was void. Such is not the function of the writ of *habeas corpus*. In the situation presented there was no denial of judicial remedy; therefore there was no denial of equal protection nor of due process of law. The decision of their counsel learned in the law, an attorney of judgment, experience and discretion, that their interests would not be furthered by filing the application, was binding upon the appellants and no inference can be drawn in view of the testimony on the trial that there was even a mistake of judgment chargeable to the attorney." *Carruthers v. Reed,* 102 F. 2d 933, *certiorari* denied in 307 U.S. 643, 59 S. Ct. 1047, 83 L. Ed. 1523.

7. The North Carolina statute codified as G.S. 9-26 provides that "all exceptions to grand jurors for and on account of their disqualifications shall be taken before the jury is sworn and impaneled to try the issue, by a motion to quash the indictment, and if not so taken, the same shall be deemed to be waived." Under the statute, a motion to quash an indictment against a Negro is the proper remedy in a criminal case where Negroes were intentionally excluded from the grand jury returning the indictment solely on the ground of race or color. *S. v. Peoples, supra; S. v. Haywood,* 94 N.C. 847. The statute and related common law practice unite to create these three rules: (1) An accused may make the motion to quash the indictment as a matter of right up to the time when he is arraigned and enters his plea; (2) the presiding judge has the discretionary power to permit the accused to make the motion to quash the indictment as a matter of grace after his plea is entered and until the petit jury is sworn and impaneled to try the case on its merits; and (3) the presiding judge has no power to entertain a motion to quash the indictment at all after the petit jury is sworn and impaneled to try the case on its merits. *S. v. Banner,* 149 N.C. 519, 63 S.E. 84; *S. v. Gardner,* 104 N.C. 739, 10 S.E. 146. A Negro defendant waives any objection to the grand jury which indicts him on the ground that Negroes were intentionally excluded from such grand jury because of their race or color unless he takes the objection by a motion to quash the indictment before entering a plea to the merits. *S. v. Banner, supra.* When a Negro defendant moves to quash an indictment on the racial exclusion theory either as a matter of right or as a matter of grace, he may offer evidence to sustain his motion.

8. The objection of a Negro charged with crime that qualified Negroes were excluded solely because of their race or color from the list of persons drawn or summoned to serve as petit jurors at his trial must be taken by

a challenge to the array or a motion to quash the panel or venire before entering upon the trial. *S. v. Parker,* 132 N.C. 1014, 43 S.E. 830. If not so taken, the objection is waived. *S. v. Kirksey, supra.*

The evidence showed, and the presiding judge found, in essence, that Hallet S. Ward and James B. McMullan, the petitioner's court appointed attorneys in the original criminal action, were competent lawyers; that they determined after deliberate consideration not to challenge the grand jury that indicted the petitioner or the petit jury that tried him on the theory that members of his race, to wit, Negroes, were intentionally excluded from the jury on account of their race or color; that they knowingly and deliberately adopted this course of procedure because they deemed the racial exclusion theory to be without merit in fact, and because this course appeared to them at the time to be to the best interest of the petitioner; and that in consequence of these things the petitioner pleaded not guilty to the indictment against him and went to trial on the merits in the original criminal action without making any objection to either the grand or the petit jury.

The presiding judge concluded as a matter of law on the basis of this evidence and these findings of fact that the petitioner, acting through his attorneys in the original criminal action, effectually waived for all time his constitutional right to object to the grand and petit juries which indicted and convicted him upon the ground that qualified Negroes were intentionally excluded from such juries solely because of their race or color by pleading not guilty and going to trial on the merits without making any objections to such juries. This legal conclusion, standing alone, is sufficient to sustain the judgment in this proceeding, if it be valid. It is too evident to admit of dispute that this legal conclusion finds full support in the principles of law enunciated in numbered paragraphs 6, 7, and 8 set forth above, and is sound unless those principles of law have been abrogated as to the petitioner by the North Carolina Post-Conviction Hearing Act. The petitioner insists that those legal principles are made inapplicable to him by this statute because "there has been no prior adjudication" as to the constitutional rights he claims in this proceeding "by any court of competent jurisdiction."

The answer to the problem posed by this contention necessarily lies in the provisions of the Post-Conviction Hearing Act. In construing this somewhat novel statute, we observe a strict judicial decorum and refrain from expressing an opinion upon any matters beyond those necessary to a determination of the proceeding now before us.

The Post-Conviction Hearing Act provides in express terms that "any person imprisoned in the penitentiary, Central Prison, common jail of any county or imprisoned in the common jail of any county and assigned to work on the roads and highways of the State under the supervision of

the State Highway and Public Works Commission, who asserts that in the proceedings which resulted in his conviction there was a substantial denial of his rights under the Constitution of the United States or of the State of North Carolina, or both, as to which there has been no prior adjudication by any court of competent jurisdiction," may apply by petition to the Superior Court for "an appropriate order with respect to the judgment or sentence in the former proceedings under which the petitioner was convicted." G.S. 15-217, 15-221.

The North Carolina Post-Conviction Hearing Act is modeled on the Illinois Post-Conviction Hearing Act, which is set forth in full in *People v. Dale,* 406 Ill. 238, 92 N.E. 2d 761. It is not designed to add to the law's delays by giving an accused two days in court where one is sufficient for the doing of substantial justice under fundamental law. It is not devised to confer upon an accused, who is defended by counsel of his own selection or competent counsel appointed by the court, a legal privilege, at his own election, to have his rights arising under the common law and the statutes adjudicated at a time of the State's choosing in the original criminal action, and his rights arising under the constitutions of his State and Nation adjudicated at a subsequent time of his own choosing in another proceeding. It is enacted to provide an adequate and available post-trial remedy for persons imprisoned under judicial decrees who suffered substantial and unadjudicated deprivations of their constitutional rights in the original criminal actions resulting in their convictions because they were prevented from claiming such constitutional rights in the original criminal actions by factors beyond their control.

To this end, the North Carolina Post-Conviction Hearing Act establishes a new judicial proceeding by which the Superior Court may probe beneath the adjudication in the original criminal action in which an imprisoned petitioner was convicted and sentenced, and grant him appropriate relief in respect to his conviction and sentence in case it determines that two specified conditions concur. These conditions are as follows: (1) That there was a substantial denial of the constitutional rights of. the petitioner in the original criminal action in which he was convicted and (2) that there has been no prior adjudication as to such constitutional rights by any court of competent jurisdiction.

When the instant proceeding is laid alongside the Post-Conviction Hearing Act as thus interpreted, it becomes plain that there was no *substantial denial* of the constitutional rights now claimed by the petitioner in the original criminal action which resulted in his conviction.

The petitioner was defended by competent counsel in the original criminal action. He was not prevented from laying claim to his alleged constitutional rights in that action by any factors beyond his control. On the contrary, he had a fair and full opportunity to assert his present

claims in the original proceeding before a court, which was empowered by law to consider them and determine their validity. Acting through his counsel, he deliberately and knowingly refrained from presenting his present claims to the court for adjudication in that proceeding because he deemed them to be without merit in fact and believed their non-assertion to be to his best interest. A litigant does not suffer a *denial* of a supposed right when he intentionally and voluntarily relinquishes it.

It follows that the presiding judge rightly ruled that the petitioner waived the claims which he now undertakes to assert. This conclusion is in accord with decisions of the United States Supreme Court and the Supreme Court of Illinois in a proceeding under the Illinois Post-Conviction Hearing Act. *Jennings v. Illinois, supra; People v. Jennings,* 411 Ill. 21, 102 N.E. 2d 824.

The petitioner's plight would be the same even if he had not waived his claims. The evidence and the findings show that his constitutional rights were not violated in the proceeding culminating in his conviction.

The judicial order staying the execution of the judgment of death automatically expires on the day of the filing of this opinion. See: G.S. 15-194.

A criminal prosecution is likely to have a tragic ending for the accused if defense attorneys are compelled to make legal bricks without factual straw.

The judgment is
Affirmed.

PARKER, J., took no part in the consideration or decision of this case.